1  Michael & Sharon  Sparlin
2  9151 E Showcase Lane
3  Tucson  AZ  85749

4
5

FILED
RECEIVED
LODGED
COPY

AUG 18 2010

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____DEPUTY

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

**Michael & Sharon  Sparlin**

Plaintiff,

vs.

**Bank of America Home Loans**

Defendant

Case #_____

# CIV 10-503  TUC FRZ

### ORIGINAL PETITION

6

7                                             Date:_____

8  Comes now  Michael & Sharon  Sparlin , hereinafter referred to as "Petitioner," and moves the
9  court for relief as herein requested:

10                                    **PARTIES**
11  Petitioner is  Michael & Sharon   Sparlin ,  9151 E Showcase Lane   Tucson   AZ 85749.
12  Currently Known Defendant(s) are/is:  Bank of America Home Loans ,  400 Countrywide Way,
13  SV-35 , CA  93065, by and through its attorney .

14                              **STATEMENT OF CAUSE**
15  Petitioner, entered into a contract for the finance of a property located at 491 S Douglas Wash
16  Road, Tucson, AZ  85641, recorded January 30, 2007 as Docket 12981, Page 7551, Sequence
17  20070201026,  hereinafter referred to as the "property."
18  Defendants, acting in concert and collusion with others, induced Petitioner to enter into a
19  predatory loan agreement with Defendant.

20  Defendants committed numerous acts of fraud against Petitioner in furtherance of a carefully
21  crafted scheme intended to defraud Petitioner.

22  Defendants failed to make proper notices to Petitioner that would have given Petitioner warning
23  of the types of tactics used by Defendants to defraud Petitioner.

24  Defendants charged false fees to Petitioner at settlement.

ORIGINAL PETITION

25   Defendants used the above referenced false fees to compensate agents of Petitioner in order to
26   induce said agents to breach their fiduciary duty to Petitioner.

27   Defendant's attorney caused to be initiated collection procedures, knowing said collection
28   procedures in the instant action were frivolous as lender is estopped from collection procedures,
29   under authority of Uniform Commercial Code 3-501, subsequent to the request by Petitioner for
30   the production of the original promissory note alleged to create a debt.

31   **IN BRIEF**
32   *(Non-factual Statement of Posture and Position)*

33   It is not the intent of Petitioner to indict the entire industry.  It is just that Plaintiff will be
34   making a number of allegations that, outside the context of the current condition of the real
35   estate industry, may seem somewhat outrageous and counter-intuitive.

36   When Petitioner accuses ordinary individuals of acting in concert and collusion with an
37   ongoing criminal conspiracy, it tends to trigger an incredulous response as it is
38   unreasonable to consider that all Agents, loan agents, appraisers, and other ordinary
39   people, just doing what they have been trained to do, are out to swindle the poor
40   unsuspecting borrower.

41   The facts Petitioner is prepared to prove are that Petitioner has been harmed by fraud
42   committed by people acting in concert and collusion, one with the other.  Petitioner has no
43   reason to believe that the Agent, loan officer, appraiser, and others were consciously aware
44   that what they were doing was part of an ongoing criminal conspiracy, only that it was,
45   and they, at the very least, kept themselves negligently uninformed of the wrongs they
46   were perpetrating.  Petitioner maintains the real culprit is the system itself, including the
47   courts, for failure to strictly enforce the consumer protection laws.

48   **CAREFULLY CRAFTED CRIMINAL CONNIVANCE**
49   *(General State of the Real Estate Industry)*

50   ***THE BEST OF INTENTIONS***

51   Prior to the 1980's and 1990's ample government protections were in place to protect
52   <u>consumers</u> and the lending industry from precisely the disaster we now experience.
53   <u>During</u> President Clinton's administration, under the guise of making housing available to

ORIGINAL PETITION

54  the poor, primary protections were relaxed which had the effect of releasing the
55  unscrupulous on the unwary.

56  Prior to deregulation in the 1980's, lenders created loans for which they held and assumed
57  the risk.  Consequently, Americans were engaged in safe and stable home mortgages.
58  With the protections removed, the unscrupulous lenders swooped in and, instead of
59  making loans available to the poor, used the opportunity to convince the unsophisticated
60  American public to do something that had been traditionally taboo; home buyers were
61  convinced to speculate with their homes, their most important investment.

62   Bank of America Home Loans , Ameriquest, Countrywide, and many others swooped in
63  and convinced Americans to sell their homes, get out of their safe mortgage agreements,
64  and speculate with the equity they had gained by purchasing homes they could not afford.
65  Lenders created loans intended to fail as, under the newly crafted system, the Lender
66  profited more from a mortgage default than from a stable loan.

67  Companies cropped up who called themselves banks when, in fact, they were only either
68  subsidiaries of banks, or unaffiliated companies that were operated for the purpose of
69  creating and selling promissory notes.  As will be demonstrated, these companies then
70  profited from the failure of the underlying loans.

71  ***HOW IT WORKS***

72  Briefly, how it works is this, the Lender would secure a large loan from a large bank,
73  convert that loan into 20 and 30 year mortgages and then sell the promise to pay to an
74  investor.

75  People would set up mortgage companies by securing a large loan from one of the major
76  banks, then convert that loan into 20 and 30 year mortgages.  In order to accomplish this
77  an Agent would contract with a seller to find a buyer, bring both seller and buyer to a
78  lender who would secure the title from the seller using the borrowed bank funds for that
79  purpose, and then trade the title to the buyer in exchange for a promissory note.

80  The lender then creates a 20 or 30 year mortgage with money the lender must repay within
81  6 months.  As soon as the closing is consummated, the promissory note is sold to an
82  investor pool.

83  Using the instant case as an example, a 175,500.00 note at 8.7072%  interest over 30 years
84  will produce $154,589.43  The lender can then offer to the investor the security instrument

ORIGINAL PETITION

85   (promissory note) at say 50% of it's future value.  The investor will, over the life of the
86   note, less approximately 3.00% servicing fees, realize $243,147.76 .  The lender can then
87   pay back the bank and retain a handsome profit in the amount of $82,687.82.  The lender,
88   however, is not done with the deal.

89   The lender signed over the promissory note to the investor at the time of the trade, but did
90   not sign over the lien document (mortgage or deed of trust).  The State of Kansas Supreme
91   Court addressed this issue and stated that such a transaction was certainly legal.  However,
92   it created a fatal flaw as the holder of the lien document, at time of sale of the security
93   instrument, received consideration in excess of the lien amount.  Since the lien holder
94   received consideration, he could not be harmed.   Therefore the lien became an
95   unenforceable document.

96   This begs the question: if keeping the lien would render it void, why would the lender not
97   simply transfer the lien with the promissory note?  The reason is because the lender will
98   hold the lien for three years, file an Internal Revenue Service Form 1099a, claim the full
99   amount of the lien as abandoned funds, and deduct the full amount from the lender's tax
100  liability.  The lender, by this maneuver, gets consideration a second time.  And still the
101  lender is not done profiting from the deal.

102  After sale of the promissory note, the lender remains as the servicer for the investor.  The
103  lender will receive 3% of each payment the lender collects and renders to the investor
104  pool.  However, if the payment is late, the lender is allowed to assess an extra 5% and keep
105  that amount.  Also, if the loan defaults, the lender stands to gain thousands for handling the
106  foreclosure.

107  The lender stands to profit more from a note that is overly expensive, than from a good
108  stable loan.   And where, you may ask, does all this profit come from?  It comes from the
109  equity the borrower had built up in the home.  And still the lender is not finished profiting
110  from the deal.

111  Another nail was driven in the American financial coffin  on the last day Congress was in
112  session in 2000 when restrictions that had been in place since the economic collapse of
113  1907 were removed.  Until 1907  investors were allowed to bet on stocks without actually
114  buying them.  This unbridled speculation led directly to an economic collapse.  As a result
115  the legislature banned the practice, until the year 2000.  In 2000 the unscrupulous lenders
116  got their way on the last day of the congressional session.   Congress removed the

ORIGINAL PETITION                                                              4 of 24

117 restriction banning derivatives and again allowed the practice, this time taking only 8 years
118 to crash the stock market.   This practice allowed the lender to profit further from the loan
119 by betting on the failure of the security instrument he had just sold to the unwary investor,
120 thus furthering the purpose of the lender to profit from both the borrower (consumer) and
121 the investor.

122 The failure of so many loans recently resulted in a seven hundred and fifty billion dollar
123 bailout at the expense of the taxpayer.   The unsuspecting consumer was lulled into
124 accepting the pronouncements of the lenders, appraisers, underwriters, and trustees as all
125 were acting under the guise of government regulation and, therefore, the borrower had
126 reason to expect good and fair dealings from all. Unfortunately, the regulations in place to
127 protect the consumer from just this kind of abuse were simply being ignored.

128 The loan origination fee from the HUD1 settlement statement is the finder's fee paid for
129 the referral of the client to the lender by a person acting as an agent for the borrower.
130 Hereinafter, the person or entity who receives any portion of the yield spread premium, or
131 a commission of any kind consequent to securing the loan agreement through from the
132 borrower will be referred to as "Agent."  The fee, authorized by the consumer protection
133 law is restricted to 1% of the principal of the note.  It was intended that the Agent, when
134 seeking out a lender for the borrower, would seek the best deal for his client rather than
135 who would pay him the most.  That was the intent, but not the reality.  The reality is that
136 Agents never come away from the table with less than 2% or 3% of the principal.  This is
137 accomplished by undisclosed fees to the Agent in order to induce the Agent to breach his
138 fiduciary duty to the borrower and convince the borrower to accept a more expensive loan
139 product than the borrower qualifies for.  This will generate more profits for the lender and,
140 consequently, for the Agent.

141 It is a common practice for lenders to coerce appraisers to give a higher appraisal than is
142 the fair market price.  This allows the lender to increase the cost of the loan product and
143 give the impression that the borrower is justified in making the purchase.

144 The lender then charges the borrower an underwriting fee in order to convince the
145 borrower that someone with knowledge has gone over the conditions of the note and
146 certified that they meet all legal criteria.  The trustee, at closing, participates actively in the
147 deception of the borrower by placing undue stress on the borrower to sign the large stack
148 of paperwork without reading it.  The trustee is, after all, to be trusted and has been paid to

ORIGINAL PETITION

149  insure the transaction.  This trust is systematically violated for the purpose of taking unfair
150  advantage of the borrower.   The entire loan process is a carefully crafted contrive
151  connivance designed and intended to induce the unsophisticated borrower into accepting a
152  loan product that is beyond the borrowers means to repay.  With all this, it should be a
153  surprise to no one that this country is having a real estate crisis.

154  ## PETITIONER WILL PROVE THE FOLLOWING
155  Petitioner is prepared to prove, by a preponderance of evidence that:

156  • Lender has no legal standing to bring collection or foreclosure claims against the
157     property;

158  • Lender is not a real party in interest in any contract which can claim a collateral
159     interest in the property;

160  • even if Lender were to prove up a contract to which Lender had standing to enforce
161     against Petitioner, no valid lien exists which would give Lender a claim against the
162     property;

163  • even if Lender were to prove up a contract to which Lender had standing to enforce
164     against Petitioner,  said contract was fraudulent in its creation as endorsement was
165     secured by acts of negligence, common law fraud, fraud by non-disclosure, fraud in
166     the inducement, fraud in the execution, usury, and breaches of contractual and
167     fiduciary obligations by Mortgagee or "Trustee" on the Deed of Trust, "Mortgage
168     Agents," "Loan Originators," "Loan Seller," "Mortgage Aggregator," "Trustee of
169     Pooled Assets," "Trustee or officers of Structured Investment Vehicle,"
170     "Investment Banker," "Trustee of Special Purpose Vehicle/Issuer of Certificates of
171     'Asset-Backed Certificates,'" "Seller of 'Asset-Backed' Certificates (shares or
172     bonds)," "Special Servicer" and Trustee, respectively, of certain mortgage loans
173     pooled together in a trust fund;

174  • Defendants have concocted a carefully crafted connivance wherein Lender
175     conspired with Agents, et al, to strip Petitioner of Petitioner's equity in the property
176     by inducing Plaintiff to enter into a predatory inflated loan product;

177  • Lender received unjust enrichment in the amount of 5% of each payment made late
178     to Lender while Lender and Lender's assigns acted as servicer of the note;

ORIGINAL PETITION                                                    6 of 24

179   • Lender and Lender's assigns, who acted as servicer in place of Lender, profited by
180       handling the foreclosure process on a contract Lender designed to have a high
181       probability of default;

182   • Lender intended to defraud Investor by converting the promissory note into a
183       security instrument and selling same to Investor;

184   • Lender intended to defraud Investor and the taxpayers of the United States by
185       withholding the lien document from the sale of the promissory note in order that
186       Lender could then hold the lien for three years, then prepare and file Internal
187       Revenue Form 1099a and falsely claim the full lien amount as abandoned funds
188       and deduct same from Lender's income tax obligation;

189   • Lender defrauded backers of derivatives by betting on the failure of the promissory
190       note the lender designed to default;

191   • participant Defendants, et al, in the securitization scheme described herein have
192       devised business plans to reap millions of dollars in profits at the expense of
193       Petitioner and others similarly situated.

194                    **PETITIONER SEEKS REMEDY**
195   In addition to seeking compensatory, consequential and other damages, Petitioner seeks
196   declaratory relief as to what (if any) party, entity or individual or group thereof is the
197   owner of the promissory note executed at the time of the loan closing, and whether the
198   Deed of Trust (Mortgage) secures any obligation of the Petitioner, and a Mandatory
199   Injunction requiring re-conveyance of the subject property to the Petitioner or, in the
200   alternative a Final Judgment granting Petitioner Quiet Title in the subject property.

201   *PETITIONER HAS BEEN HARMED*

202   Petitioner has suffered significant harm and detriment as a result of the actions of Defendants.

203   Such harm and detriment includes economic and non-economic damages, and injuries to
204   Petitioner's mental and emotional health and strength, all to be shown according to proof at trial.

205   In addition, Petitioner will suffer grievous and irreparable further harm and detriment unless the
206   equitable relief requested herein is granted.

ORIGINAL PETITION

207                        **STATEMENT OF CLAIM**

208      *DEFENDANTS LACK STANDING*

209           **No evidence of Contractual Obligation**

210   Defendants claim a controversy based on a contractual violation by Petitioner but have failed to
211   produce said contract. Even if Defendants produced evidence of the existence of said contract in
212   the form of an allegedly accurate photocopy of said document, a copy is only hearsay evidence
213   that a contract actually existed at one point in time. A copy, considering the present state of
214   technology, could be easily altered. As Lender only created one original and that original was
215   left in the custody of Lender, it was imperative that Lender protect said instrument.

216   In as much as the Lender is required to present the original on demand of Petitioner, there can be
217   no presumption of regularity when the original is not so produced.   In as much as Lender has
218   refused Petitioner's request of the chain of custody of the security instrument in question by
219   refusing to identify all current and past real parties in interest, there is no way to follow said
220   chain of custody to insure, by verified testimony, that no alterations to the original provisions in
221   the contract have been made.   Therefore, the alleged copy of the original is only hearsay
222   evidence that an original document at one time existed. Petitioner maintains that, absent
223   production of admissible evidence of a contractual obligation on the part of Petitioner,
224   Defendants are without standing to invoke the subject matter jurisdiction of the court.

225           **No Proper Evidence of Agency**

226   Defendants claim agency to represent the principal in a contractual agreement involving
227   Petitioner, however, Defendants have failed to provide any evidence of said agency other than a
228   pronouncement that agency has been assigned by some person, the true identity and capacity of
229   whom has not been established. Defendants can hardly claim to be agents of a principal then
230   refuse to identify said principal. All claims of agency are made from the mouth of the agent with
231   no attempt to provide admissible evidence from the principal.

232   Absent proof of agency, Defendants lack standing to invoke the subject matter jurisdiction of the
233   court.

ORIGINAL PETITION

234       **Special Purpose Vehicle**

235    Since the entity now claiming agency to represent the holder of the security instrument is not the
236    original lender, Petitioner has reason to believe that the promissory note, upon consummation of
237    the contract, was converted to a security and sold into a special purpose vehicle and now resides
238    in a Real Estate Mortgage Investment Conduit (REMIC)   as defined by the Internal Revenue
239    Code and as such, cannot be removed from the REMIC as such would be a prohibited
240    transaction.   If the mortgage was part of a special purpose vehicle and was removed on
241    consideration of foreclosure, the real party in interest would necessarily be the trustee of the
242    special purpose vehicle.   Nothing in the pleadings of Defendants indicates the existence of a
243    special purpose vehicle, and the lack of a proper chain of custody documentation gives Petitioner
244    cause to believe defendant is not the proper agent of the real party in interest.

245       *CRIMINAL CONSPIRACY AND THEFT*

246    Defendants, by and through Defendant's Agents, conspired with other Defendants, et al, toward
247    a criminal conspiracy to defraud Petitioner.  Said conspiracy acts include but are not limited to
248    acts of negligence, breach of fiduciary duty, common law fraud, fraud by non-disclosure, and
249    tortuous acts of conspiracy and theft, to include but not limited to, the assessment of improper
250    fees to Petitioner by Lender, which were then used to fund the improper payment of commission
251    fees to Agent in order to induce Agent to violate Agent's fiduciary duty to Petitioner.

252       *AGENT PRACTICED UP-SELLING*

253    By and through the above alleged conspiracy, Agent practiced up-selling to Petitioner.  In so
254    doing, Agent violated the trust relationship actively cultivated by Agent and supported by fact
255    that Agent was licensed by the state.  Agent further defrauded Petitioner by failing to disclose
256    Agent's conspiratorial relationship to Lender,   Agent violated Agent's fiduciary duty to
257    Petitioner and the duty to provide fair and honest services, through a series of carefully crafted
258    connivances, wherein Agent proactively made knowingly false and misleading statements of
259    alleged fact to Petitioner, and by giving partial disclosure of facts intended to directly mislead
260    Petitioner for the purpose of inducing Petitioner to make decisions concerning the acceptance of
261    a loan product offered by the Lender.  Said loan product was more expensive than Petitioner
262    could legally afford. Agent acted with full knowledge that Petitioner would have made a
263    different decision had Agent given complete disclosure.

ORIGINAL PETITION

264    *FRAUDULENT INDUCEMENT*

265    Lender maliciously induced Petitioner to accept a loan product, Lender knew, or should have
266    known, Petitioner could not afford in order to unjustly enrich Lender.

267    *EXTRA PROFIT ON SALE OF PREDATORY LOAN PRODUCT*

268    Said more expensive loan product was calculated to produce a higher return when sold as a
269    security to an investor who was already waiting to purchase the loan as soon as it could be
270    consummated.

271    **Extra Commission for Late Payments**

272    Lender acted with deliberate malice in order to induce Petitioner to enter into a loan agreement
273    that Lender intended Petitioner would have difficulty paying.  The industry standard payment to
274    the servicer for servicing a mortgage note is 3% of the amount collected.  However, if the
275    borrower is late on payments, a 5% late fee is added and this fee is retained by the servicer.
276    Thereby, the Lender stands to receive more than double the regular commission on collections if
277    the borrower pays late.

278    **Extra Income for Handling Foreclosure**

279    Lender acted with deliberate malice in order to induce petitioner to enter into a loan agreement
280    on which Lender intended petitioner to default.  In case of default, the Lender, acting as servicer,
281    receives considerable funds for handling and executing the foreclosure process.

282    **Credit Default Swap Gambling**

283    Lender, after deliberately creating a loan intended to default is now in a position to bet on credit
284    default swap, commonly referred to as a derivative as addressed more fully below.  Since Lender
285    designed the loan to fail, betting on said failure is essentially a sure thing.

286    *LENDER ATTEMPTING TO FRAUDULENTLY COLLECT ON VOID LIEN*

287    Lender sold the security instrument after closing and received consideration in an amount in
288    excess of the lien held by Lender.  Since Lender retained the lien document upon the sale of the
289    security instrument, Lender separated the lien from said security instrument, creating a fatal and
290    irreparable flaw.

ORIGINAL PETITION

291   When Lender received consideration while still holding the lien and said consideration was in
292   excess of the amount of the lien, Lender was in a position such that he could not be harmed and
293   could not gain standing to enforce the lien.  The lien was, thereby, rendered void.

294   Since the separation of the lien from the security instrument creates such a considerable concern,
295   said separation certainly begs a question: "Why would the Lender retain the lien when selling the
296   security instrument?"

297   When you follow the money the answer is clear.  The Lender will hold the lien for three years,
298   then file an IRS Form 1099a and claim the full amount of the lien as abandoned funds and deduct
299   the full amount from Lender's tax liability, thereby, receiving consideration a second time.

300   Later, in the expected eventuality of default by petitioner, Lender then claimed to transfer the
301   lien to the holder of the security, however, the lien once satisfied, does not gain authority just
302   because the holder, after receiving consideration, decides to transfer it to someone else.

303   ***LENDER PROFIT BY CREDIT DEFAULT SWAP DERIVATIVES***

304   Lender further stood to profit by credit default swaps in the derivatives market, by way of inside
305   information that Lender had as a result of creating the faulty loans sure to default.  Lender was
306   then free to invest on the bet that said loan would default and stood to receive unjust enrichment
307   a third time.  This credit default swap derivative market scheme is almost totally responsible for
308   the stock market disaster we now experience as it was responsible for the stock market crash in
309   1907.

310   ***LENDER CHARGED FALSE FEES***

311   Lender charged fees to Petitioner that were in violation of the limitations imposed by the Real
312   Estate Settlement Procedures Act as said fees were simply contrived and not paid to a third party
313   vendor.

314   Lender charged other fees that were a normal part of doing business and should have been
315   included in the finance charge.

316   Below is a listing of the fees charged at settlement.  Neither at settlement, nor at any other time
317   did Lender or Trustee provide documentation to show that the fees herein listed were valid,
318   necessary, reasonable, and proper to charge Petitioner.

ORIGINAL PETITION

| | | |
|---|---|---|
| 804 | Doc Prep Fee | $325.00 |
| 805 | Verification Fee | $25.00 |
| 806 | Flood Determination Fee | $7.00 |
| 807 | Life of Loan Flood Chart | $5.00 |
| 808 | Application Fee | $315.00 |
| 809 | Tax Service Fee | $75.00 |
| 810 | Underwriting Fee | $325.00 |
| 901 | Interest from 1/30/07 to 2/1/07 @ $36.0618/day ( 2 days) | $72.12 |
| 903 | Hazard Insurance Premium | $486.72 |
| 1001 | Hazard Insurance | $121.68 |
| 1004 | County Property Taxes | $16.67 |
| 1101 | Settlement fee | $251.75 |
| 1103 | Shipping/Handling | $22.00 |
| 1104 | Wire Fee | $20.00 |
| 1105 | eDoc Fee | $25.00 |
| 1109 | Lender's Coverage | $373.10 |
| 1111 | Recording Service Charge | $25.00 |
| 1112 | Endorsement Fee | $50.00 |

319   Debtor is unable to determine whether or not the above fees are valid in accordance with the
320   restrictions provided by the various consumer protection laws.  Therefore, please provide; a
321   complete billing from each vendor who provided the above listed services; the complete contact
322   information for each vendor who provided a billed service; clearly stipulate as to the specific
323   service performed; a showing that said service was necessary; a showing that the cost of said
324   service is reasonable; a showing of why said service is not a regular cost of doing business that
325   should rightly be included in the finance charge.

326   The above charges are hereby disputed and deemed unreasonable until such time as said charges
327   have been demonstrated to be reasonable, necessary, and in accordance with the limitations and
328   restrictions included in any and all laws, rules, and regulations intended to protect the consumer.

329   In the event lender fails to properly document the above charges, borrower will consider same as
330   false charges.  The effect of the above amounts that borrower would pay over the life of the note
331   will be an overpayment of $171,246.15  This amount will be reduced by the amount of items
332   above when said items are fully documented.

333   ***RESPA PENALTY***

334   From a cursory examination of the records, with the few available, the apparent RESPA
335   violations are as follows: Good Faith Estimate not within limits, No HUD-1 Booklet, Truth In
336   Lending Statement not within limits compared to Note, Truth in Lending Statement not timely
337   presented, HUD-1 not presented at least one day before closing, No Holder Rule Notice in Note,
338   No 1st Payment Letter.

ORIGINAL PETITION

339   The closing documents included no signed and dated : Financial Privacy Act Disclosure; Equal
340   Credit Reporting Act Disclosure; notice of right to receive appraisal report; servicing disclosure
341   statement; borrower's Certification of Authorization; notice of credit score; RESPA servicing
342   disclosure letter; loan discount fee disclosure; business insurance company arrangement
343   disclosure; notice of right to rescind.

344   The courts have held that the borrower does not have to show harm to claim a violation of the
345   Real Estate Settlement Procedures Act, as the Act was intended to insure strict compliance. And,
346   in as much as the courts are directed to assess a penalty of no less than two hundred dollars and
347   no more than two thousand, considering the large number enumerated here, it is reasonable to
348   consider that the court will assess the maximum amount for each violation.

349   Since the courts have held that the penalty for a violation of RESPA accrues at consummation of
350   the note, borrower has calculated that, the number of violations found in a cursory examination
351   of the note, if deducted from the principal, would result in an overpayment on the part of the
352   borrower, over the life of the note, of $298,405.25.

353   If the violation penalty amounts for each of the unsupported fees listed above are included, the
354   amount by which the borrower would be defrauded is $272,656.59

355   Adding in RESPA penalties for all the unsupported settlement fees along with the TILA/Note
356   variance, it appears that lender intended to defraud borrower in the amount of $913,554.30

357   ### *LENDER CONSPIRED WITH APPRAISER*

358   Lender, in furtherance of the above referenced conspiracy, conspired with appraiser for the
359   purpose of preparing an appraisal with a falsely stated price, in violation of appraiser's fiduciary
360   duty to Petitioner and appraiser's duty to provide fair and honest services, for the purpose of
361   inducing Petitioner to enter into a loan product that was fraudulent toward the interests of
362   Petitioner.

363   ### *LENDER CONSPIRED WITH TRUSTEE*

364   Lender conspired with the trust Agent at closing to create a condition of stress for the specific
365   purpose of inducing Petitioner to sign documents without allowing time for Petitioner to read and
366   fully understand what was being signed.

ORIGINAL PETITION

367  The above referenced closing procedure was a carefully crafted connivance, designed and
368  intended to induce Petitioner, through shame and trickery, in violation of trustee's fiduciary duty
369  to Petitioner and the duty to provide fair and honest services, to sign documents that Petitioner
370  did not have opportunity to read and fully understand, thereby, denying Petitioner full disclosure
371  as required by various consumer protection statutes.

372  ### *DECEPTIVE ADVERTISING AND OTHER UNFAIR BUSINESS PRACTICES*

373  In the manner in which Defendants have carried on their business enterprises, they have engaged
374  in a variety of unfair and unlawful business practices prohibited by *15 USC Section 45* et seq.
375  (Deceptive Practices Act).

376  Such conduct comprises a pattern of business activity within the meaning of such statutes, and
377  has directly and proximately caused Petitioner to suffer economic and non-economic harm and
378  detriment in an amount to be shown according to proof at trial of this matter.

379  ### *EQUITABLE TOLLING FOR TILA AND RESPA*

380  The Limitations Period for Petitioners' Damages Claims under TILA and RESPA should be
381  Equitably Tolled due to the DEFENDANTS' Misrepresentations and Failure to Disclose.

382  Any claims for statutory and other money damages under the Truth in Lending Act *(15 U.S.C. §*
383  *1601,* et. seq.) and under the Real Estate Settlement Procedures Act *(12 U.S.C. § 2601* et. seq.)
384  are subject to a one-year limitations period; however, such claims are subject to the equitable
385  tolling doctrine. The Ninth Circuit has interpreted the TILA limitations period in § 1640(e) as
386  subject to equitable tolling. In *King v. California, 784 F.2d 910 (9th Cir.1986),* the court held
387  that given the remedial purpose of TILA, the limitations period should run from the date of
388  consummation of the transaction, but that "the doctrine of equitable tolling may, in appropriate
389  circumstances, suspend the limitations period until the borrower discovers or has reasonable
390  opportunity to discover the fraud or nondisclosures that form the basis of the TILA action." *King*
391  *v. California, 784 F.2d 910, 915 9th* Cir. 1986).

392  Likewise, while the Ninth Circuit has not taken up the question whether *12 U.S.C. § 2614,* the
393  anti-kickback provision of **RESPA,** is subject to equitable tolling, other Courts have, and hold
394  that such limitations period may be equitably tolled. The Court of Appeals for the District of
395  Columbia held that § 2614 imposes a strictly jurisdictional limitation, *Hardin v. City Title &*

ORIGINAL PETITION

396  *Escrow Co., 797 F.2d 1037, 1039-40 (D.C. Cir. 1986),* while the Seventh Circuit came to the
397  opposite conclusion. *Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1164 (7th*
398  *Cir. 1997).* District courts have largely come down on the side of the Seventh Circuit in holding
399  that the one-year limitations period in § 2614 is subject to equitable tolling. See, e.g., *Kerby v.*
400  *Mortgage Funding Corp., 992 F.Supp. 787, 791-98 (D.Md.1998); Moll v. U.S. Life Title Ins. Co.,*
401  *700 F.Supp. 1284, 1286-89 (S.D.N.Y.1988).* Importantly, the Ninth Circuit, as noted above, has
402  interpreted the TILA limitations period in *15 U.S.C. § 1640* as subject to equitable tolling; the
403  language of the two provisions is nearly identical. *King v. California, 784 F.2d at 914.* While not
404  of precedential value, this Court has previously found both the TILA and **RESPA** limitations
405  periods to be subject to equitable tolling. *Blaylock v. First American Title Ins. Co., 504*
406  *F.Supp.2d 1091,* (W.D. Wash. 2007). 1106-07.

407  The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on excusable delay
408  by the Petitioner," and inquires whether "a reasonable Petitioner would ... have known of the
409  existence of a possible claim within the limitations period." *Johnson v. Henderson, 314 F.3d*
410  *409, 414 (9th Cir.2002), Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir.2000).*
411  Equitable tolling focuses on the reasonableness of the Petitioner's delay and does not depend on
412  any wrongful conduct by the Defendants. Santa Maria. at 1178.

413  ### *BUSINESS PRACTICES CONCERNING DISREGARDING OF UNDERWRITING*
414  ### *STANDARDS*

415  Traditionally, Lenders required borrowers seeking mortgage loans to document their income and
416  assets by, for example, providing W-2 statements, tax returns, bank statements, documents
417  evidencing title, employment information, and other information and documentation that could
418  be analyzed and investigated for its truthfulness, accuracy, and to determine the borrower's
419  ability to repay a particular loan over both the short and long term. Defendants deviated from and
420  disregarded these standards, particularly with regard to its riskier and more profitable loan
421  products.

422  **Low-Documentation/No-Documentation Loans.**

423  Driven by its desire for market share and a perceived need to maintain competitiveness with the
424  likes of Countrywide, Defendants began to introduce an ever increasing variety of low and no
425  documentation loan products, including the HARMs and HELOCs described hereinabove, and
426  began to deviate from and ease its underwriting criteria, and then to grant liberal exceptions to
ORIGINAL PETITION

427   the already eased underwriting standards to the point of disregarding such standards. This
428   quickened the loan origination process, allowing for the generation of more and more loans
429   which could then be resold and/or securitized in the secondary market.

430   Defendants marketed no-documentation/low-documentation loan programs that included ARMs
431   and HELOCs, among others, in which loans were given based on the borrower's "stated income"
432   or "stated assets" (SISA) neither of which were verified. Employment was verbally confirmed, if
433   at all, but not further investigated, and income, if it was even considered as a factor, was to be
434   roughly consistent with incomes in the types of jobs in which the borrower was employed. When
435   borrowers were requested to document their income, they were able to do so through information
436   that was less reliable than in a full-documentation loan.

437   For stated income loans, it became standard practice for loan processors, loan officers and
438   underwriters to rely on www.salary.com to see if a stated income was reasonable.  Such stated
439   income loans, emphasizing loan origination from a profitability standpoint at the expense of
440   determining the ability of the borrower to repay the loan from an underwriting standpoint,
441   encouraged the overstating and/or fabrication of income.

442   **Easing of Underwriting Standards**

443   In order to produce more loans that could be resold in the secondary mortgage market,
444   Defendants also relaxed, and often disregarded, traditional underwriting standards used to
445   separate acceptable from unacceptable risk. Examples of such relaxed standards were reducing
446   the base FICO score needed for a SISA loan.

447   Other underwriting standards that Defendants relaxed included qualifying interest rates (the rate
448   used to determine whether borrowers can afford the loan), loan to value ratios (the amount of
449   loan(s) compared to the appraised/sale price of the property, whichever is lower), and debt-to-
450   income ratios (the amount of monthly income compared to monthly debt service payments and
451   other monthly payment obligations.

452   With respect to ARMS, Defendants underwrote loans without regard to the borrower's long-term
453   financial circumstances, approving the loan based on the initial fixed rate without taking into
454   account whether the borrower could afford the substantially higher payment that would
455   inevitably be required during the remaining term of the loan.

ORIGINAL PETITION

456   With respect to HELOCs, Defendants underwrote and approved such loans based only on the
457   borrower's ability to afford the interest-only payment during the initial draw period of the loan,
458   rather than on the borrower's ability to afford the subsequent, fully amortized principal and
459   interest payments.

460   As Defendants pushed to expand market share, they eased other basic underwriting standards.
461   For example, higher loan-to-value (LTV) and combined loan-to-value (CLTV) ratios were
462   allowed. Likewise, higher debt-to-income (DTI) ratios were allowed. At the same time that they
463   eased underwriting standards the Defendants also were encouraging consumers to go further into
464   debt in order to supply the very lucrative aftermarket of mortgage backed securities. The relaxed
465   underwriting standards created the aftermarket supply they needed. As a result, the Defendants
466   made it easy for the unwary consumer to take on more debt than he could afford by encouraging
467   unsound financial practices, all the while knowing defaults would occur more and more
468   frequently as the credit ratios of citizens reached the limit of the new relaxed underwriting
469   standards.

470   Defendants knew, or in the exercise of reasonable care should have known, from its own
471   underwriting guidelines industry standards that it was accumulating and selling/reselling risky
472   loans that were likely to end up in default. However, as the pressure mounted to increase market
473   share and originate more loans, Defendants began to grant "exceptions" even to its relaxed
474   underwriting guidelines. Such was the environment that loan officers and underwriters were,
475   from time to time, placed in the position of having to justify why they did not approve a loan that
476   failed to meet underwriting criteria.

477   **Risk Layering**

478   Defendants compromised its underwriting even further by risk layering, i.e. combining high risk
479   loans with one or more relaxed underwriting standards.

480   Defendants knew, or in the exercise of reasonable care should have known, that layered risk
481   would increase the likelihood of default. Among the risk layering Defendants engaged in were
482   approving ARM loans with little to no down payment, little to no documentation, and high
483   DTI/LTV/CLTV ratios. Despite such knowledge, Defendants combined these very risk factors in
484   the loans it promoted to borrowers.

ORIGINAL PETITION

485   Loan officers and mortgage Agents aided and abetted this scheme by working closely with other
486   mortgage Lenders/mortgage bankers to increase loan originations, knowing or having reason to
487   believe that Defendants and other mortgage Lenders/mortgage bankers with whom they did
488   business ignored basic established underwriting standards and acted to mislead the borrower, all
489   to the detriment of the borrower and the consumer of loan products.

490   Petitioner is informed and believe, and on that basis allege, that Defendants, and each of them,
491   engaged and/or actively participated in, authorized, ratified, or had knowledge of, all of the
492   business practices described above in paragraphs 30-42 of this Complaint

493   ***UNJUST ENRICHMENT***

494   Petitioner is informed and believes that each and all of the Defendants received a benefit at
495   Petitioner's expense, including but not limited to the following: To the Agent, commissions,
496   yield spread premiums, spurious fees and charges, and other "back end" payments in amounts to
497   be proved at trial; To the originating Lender, commissions, incentive bonuses, resale premiums,
498   surcharges and other "back end" payments in amounts to be proved at trial; To the investors,
499   resale premiums, and high rates of return; To the servicers including EMS, servicing fees,
500   percentages of payment proceeds, charges, and other "back end" payments in amounts to be
501   proved at trial; To all participants, the expectation of future revenues from charges, penalties and
502   fees paid by Petitioner when the unaffordable LOAN was foreclosed or refinanced.

503   By their misrepresentations, omissions and other wrongful acts alleged heretofore, Defendants,
504   and each of them, were unjustly enriched at the expense of Petitioner, and Petitioner was unjustly
505   deprived, and is entitled to restitution in the amount of $913,554.30

506   ***CLAIM TO QUIET TITLE.***

507   Petitioner properly averred a claim to quiet title. Petitioner included both the street address, and
508   the Assessor's Parcel Number for the property. Petitioner has set forth facts concerning the title
509   interests of the subject property. Moreover, as shown above, Petitioner's claims for rescission
510   and fraud are meritorious. As such, Petitioner's bases for quiet title are meritorious as well.

511   Defendants have no title, estate, lien, or interest in the Subject Property in that the purported
512   power of sale contained in the Deed of Trust is of no force or effect because Defendants' security
513   interest in the Subject Property has been rendered void and that the Defendants are not the holder

ORIGINAL PETITION

514   in due course of the Promissory Note. Moreover, because Petitioner properly pled all Defendants'
515   involvement in a fraudulent scheme, all Defendants are liable for the acts of its co-conspirators,

516   "a Petitioner is entitled to damages from those Defendants who concur in the tortuous
517   scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortgage Co., 24 Cal.*
518   *3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); Novartis Vaccines and Diagnostics, Inc.*
519   *v. Stop Huntingdon Animal Cruelty USA, Inc., 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d*
520   *27 (1st Dist. 2006); Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 47 Cal.*
521   *Rptr. 2d 752 (2d Dist. 1995).*

## SUFFICIENCY OF PLEADING

522

523   Petitioner has sufficiently pled that relief can be granted on each and every one of the
524   Complaint's causes of action. A complaint should not be dismissed "unless it appears beyond
525   doubt that the Petitioner can prove no set of facts in support of Petitioner claim which would
526   entitle Petitioner to relief." *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* "All
527   allegations of material fact in the complaint are taken as true and construed in the light most
528   favorable to Petitioner." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir. 1996).*

529   Attendant, the Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc.
530   8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal
531   theories, and seeks remedies to which Petitioner is entitled. *Balistreri v. Pacifica Police Dept., 901 F.2d*
532   *696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).* Moreover, the legal
533   conclusions in the Complaint can and should be drawn from the facts alleged, and, in turn, the court
534   should accept them as such. *Clegg v. Cult Awareness Network, 18 F.3d 752* (9th Cir, 1994). Lastly,
535   Petitioner's complaint contains claims and has a probable validity of proving a "set of facts" in support of
536   their claim entitling them to relief. *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore,
537   relief as requested herein should be granted.

## CAUSES OF ACTION

538

## BREACH OF FIDUCIARY DUTY

539

540   Defendants Agent, appraiser, trustee, Lender, et al, and each of them, owed Petitioner a fiduciary
541   duty of care with respect to the mortgage loan transactions and related title activities involving
542   the Trust Property.

ORIGINAL PETITION

543 Defendants breached their duties to Petitioner by, *inter alia,* the conduct described above. Such
544 breaches included, but were not limited to, ensuring their own and Petitioners' compliance with
545 all applicable laws governing the loan transactions in which they were involved, including but
546 not limited to, TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under.

547 Defendant's breaches of said duties were a direct and proximate cause of economic and non-
548 economic harm and detriment to Petitioner(s).

549 Petitioner did suffer economic, non-economic harm, and detriment as a result of such conduct,
550 all to be shown according to proof at trial of this matter.

551 *CAUSE OF ACTION - NEGLIGENCE/NEGLIGENCE PER SE*

552 Defendants owed a general duty of care with respect to Petitioners, particularly concerning their
553 duty to properly perform due diligence as to the loans and related transactional issues described
554 hereinabove.

555 In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations
556 X and Z promulgated there under to, among other things, provide proper disclosures concerning
557 the terms and conditions of the loans they marketed, to refrain from marketing loans they knew
558 or should have known that borrowers could not afford or maintain, and to avoid paying undue
559 compensation such as "yield spread premiums" to mortgage Agents and loan officers.

560 Defendants knew or in the exercise of reasonable care should have known, that the loan
561 transactions involving Petitioner and other persons similarly situated were defective, unlawful,
562 violative of federal and state laws and regulations, and would subject Petitioner to economic and
563 non-economic harm and other detriment.

564 Petitioner is among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and
565 Z promulgated there under were intended and designed to protect, and the conduct alleged
566 against Defendants is the type of conduct and harm which the referenced statutes and regulations
567 were designed to deter.

568 As a direct and proximate result of Defendant's negligence, Petitioner suffered economic and
569 non-economic harm in an amount to be shown according to proof at trial.

ORIGINAL PETITION

570    **AGENT: COMMON LAW FRAUD**

571    If any Agents' misrepresentations made herein were not intentional, said misrepresentations were
572    negligent. When the Agents made the representations alleged herein, he/she/it had no reasonable
573    ground for believing them to be true.

574    Agents made these representations with the intention of inducing Petitioner to act in reliance on
575    these representations in the manner hereafter alleged, or with the expectation that Petitioner
576    would so act.

577    Petitioner is informed and believes that Agent et al, facilitated, aided and abetted various Agents
578    in their negligent misrepresentation, and that various Agents were negligent in not implementing
579    procedures such as underwriting standards oversight that would have prevented various Agents
580    from facilitating the irresponsible and wrongful misrepresentations of various Agents to
581    Defendants.

582    Petitioner is informed and believes that Agent acted in concert and collusion with others named
583    herein in promulgating false representations to cause Petitioner to enter into the LOAN without
584    knowledge or understanding of the terms thereof.

585    As a proximate result of the negligent misrepresentations of Agents as herein alleged, the
586    Petitioner sustained damages, including monetary loss, emotional distress, loss of credit, loss of
587    opportunities, attorney fees and costs, and other damages to be determined at trial. As a
588    proximate result of Agents' breach of duty and all other actions as alleged herein, Defendants has
589    suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and
590    mental and physical pain and anguish, all to Petitioner's damage in an amount to be established
591    at trial.

592    **PETITIONER PROPERLY AVERRED A CLAIM FOR BREACH OF THE IMPLIED**
593    **COVENANT OF GOOD FAITH AND FAIR DEALING.**

594    Petitioner properly pled Defendants violated the breach of implied covenant of good faith and
595    fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its
596    performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261*
597    *Cal. Rptr. 735 (1989);* Rest.2d Contracts § 205. A mortgage Agent has fiduciary duties. *Wyatt v.*

ORIGINAL PETITION

598   *Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v*
599   *Jones, (2004) 33 Cal. 4th 917,* the court stated:

600   In the area of insurance contracts the covenant of good faith and fair dealing has taken on a
601   particular significance, in part because of the special relationship between the insurer and the
602   insured. The insurer, when determining whether to settle a claim, must give at least as much
603   consideration to the welfare of its insured as it gives to its own interests. . . The standard is
604   premised on the insurer's obligation to protect the insured's interests . . . *Id. at 937.*

605   Likewise, there is a special relationship between an Agent and borrower. "A person who
606   provides Agency services to a borrower in a covered loan transaction by soliciting Lenders or
607   otherwise negotiating a consumer loan secured by real property, is the fiduciary of the
608   consumer...this fiduciary duty [is owed] to the consumer regardless of whom else the Agent may
609   be acting as an Agent for . . . The fiduciary duty of the Agent is to deal with the consumer in
610   *good faith.* If the *Agent knew or should have known that the Borrower will or has a likelihood of*
611   *defaulting ... they have a fiduciary duty to the borrower not* to place them in that loan."
612   (California Department of Real Estate, *Section 8: Fiduciary Responsibility,* www.dre.ca.gov).
613   [*Emphasis Added*].

614   All Defendants, willfully breached their implied covenant of good faith and fair dealing with
615   Petitioner when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to
616   provide accurate Right to Cancel Notices; (3) Placed Petitioner into Petitioner's current loan
617   product without regard for other more affordable products; (4) Placed Petitioner into a loan
618   without following proper underwriting standards; (5) Failed to disclose to Petitioner that
619   Petitioner was going to default because of the loan being unaffordable; (6) Failed to perform
620   valid and /or properly documented substitutions and assignments so that Petitioner could
621   ascertain Petitioner rights and duties; and (7) Failed to respond in good faith to Petitioner's
622   request for documentation of the servicing of Petitioner's loan and the existence and content of
623   relevant documents. Additionally, Defendants breached their implied covenant of good faith and
624   fair dealing with Petitioner when Defendants initiated foreclosure proceedings even without the
625   right under an alleged power of sale because the purported assignment was not recorded and by
626   willfully and knowingly financially profiting from their malfeasance. Therefore, due to the
627   special relationship inherent in a real estate transaction between Agent and borrower, *and* all
628   Defendants' participation in the conspiracy, the Motion to Dismiss should be denied.

ORIGINAL PETITION

629    ***CAUSE OF ACTION VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. §1601 ET***
630    ***SEQ***

631    Petitioner hereby incorporates by reference, re-pleads and re-alleges each and every allegation
632    contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of
633    Action as though the same were set forth herein.

634    Petitioner is informed and believes that Defendant's violation of the provisions of law rendered
635    the credit transaction null and void, invalidates Defendant's claimed interest in the Subject
636    Property, and entitles Petitioner to damages as proven at trial.

637    ***INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS***

638    The conduct committed by Defendants, driven as it was by profit at the expense of increasingly
639    highly leveraged and vulnerable consumers who placed their faith and trust in the superior
640    knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by
641    civilized society.

642    Defendants either knew that their conduct would cause Petitioner to suffer severe emotional
643    distress, or acted in conscious and/or reckless disregard of the probability that such distress
644    would occur.

645    Petitioner did in fact suffer severe emotional distress as an actual and proximate result of the
646    conduct of Defendants as described hereinabove.

647    As a result of such severe emotional distress, Petitioner suffered economic and non economic
648    harm and detriment, all to be shown according to proof at trial of this matter.

649    Petitioner demands that Defendants provide Petitioner with release of lien on the lien signed by
650    Petitioner and secure to Petitioner quite title;

651    Petitioner demands Defendants disgorge themselves of all enrichment received from Petitioner
652    as payments to Defendants based on the fraudulently secured promissory note in an amount to be
653    calculated by Defendants and verified to Petitioner;

654    Petitioner further demands that Defendants pay to Petitioner an amount equal to treble the
655    amount Defendants intended to defraud Petitioner of which amount Petitioner calculated to be
656    equal to $2,740,662.90

ORIGINAL PETITION

657                                           **PRAYER**

658    WHEREFORE, Petitioner prays for judgment against the named Defendants, and each of them,

659    as follows:

660          For an emergency restraining order enjoining lender and any successor in interest from

661          foreclosing on Petitioner's Property pending adjudication of Petitioner's claims set forth

662          herein;

663          For a permanent injunction enjoining Defendants from engaging in the fraudulent,

664          deceptive, predatory and negligent acts and practices alleged herein;

665          For quiet title to Property;

666          For rescission of the loan contract and restitution by Defendants to Petitioner according

667          to proof at trial;

668          For disgorgement of all amounts wrongfully acquired by Defendants according to proof

669          at trial;

670          For actual monetary damages in the amount $913,554.30;

671          For pain and suffering due to extreme mental anguish in an amount to be determined at

672          trial.

673          For pre-judgment and post-judgment interest according to proof at trial;

674          For punitive damages according to proof at trial in an amount equal to $2,740,662.90.

675          For attorney's fees and costs as provided by statute; and,

676          For such other relief as the Court deems just and proper.

677    **Respectfully Submitted,**

678

679    *Michael Benson Sparlin*          *Sharon Sparlin*

680    **Michael Sparlin**                      **Sharon Sparlin**

ORIGINAL PETITION