1 Michael & Sharon  Sparlin
2 9151 E Showcase Lane
3 Tucson , AZ  85749
4

FILED ___ RECEIVED    LODGED ___ COPY

1    AUG 1 8 2010    1

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
___ DEPUTY

5              UNITED STATES DISTRICT COURT
6                   DISTRICT OF ARIZONA

**Michael & Sharon  Sparlin**          Case # CIV 10-503 TUC FRZ

Plaintiff,

        vs.                                PETITION FOR TEMPORARY
                                                INJUNCTION
**Bank of America Home Loans**

Defendant

7

8                                    Date: _____

9   Comes now Michael & Sharon  Sparlin , hereinafter referred to as "Petitioner," and moves the
10  court for relief as herein requested:

11                                    **PARTIES**
12  Petitioner is Michael & Sharon  Sparlin , 9151 E Showcase Lane  Tucson  AZ 85749. Currently
13  Known Defendant(s) are/is:   Bank of America Home Loans

14                              **STATEMENT OF CAUSE**
15  Petitioner, entered into a consumer contract for the for the purchase of new construction property
16  located at 491 S Douglas Wash Road, Tucson, AZ  85641 recorded January 30, 2007 as Docket
17  12981, Page 7551, Sequence 20070201026 hereinafter referred to as the "property."
18  Defendants, acting in concert and collusion with others, induced Petitioner to enter into a
19  predatory loan agreement with Defendant.

20  Defendants committed numerous acts of fraud against Petitioner in furtherance of a carefully
21  crafted scheme intended to defraud Petitioner.

22  Defendants failed to make proper notices to Petitioner that would have given Petitioner warning
23  of the types of tactics used by Defendants to defraud Petitioner.

24  Defendants charged false fees to Petitioner at settlement.

PRELIMINARY INJUNCTION            1 of 26

25  Defendants used the above referenced false fees to compensate agents of Petitioner in order to
26  induce said agents to breach their fiduciary duty to Petitioner.

27  Defendant's attorney caused to be initiated collection procedures, knowing said collection
28  procedures in the instant action were frivolous as lender is estopped from collection procedures,
29  under authority of Uniform Commercial Code 3-501, subsequent to the request by Petitioner for
30  the production of the original promissory note alleged to create a debt.

31                                    **IN BRIEF**
32                      *(Non-factual Statement of Posture and Position)*

33   It is not the intent of Petitioner to indict the entire industry.  It is just that Plaintiff will be
34  making a number of allegations that, outside the context of the current condition of the real
35  estate industry, may seem somewhat outrageous and counter-intuitive.

36  When Petitioner accuses ordinary individuals of acting in concert and collusion with an
37  ongoing criminal conspiracy, it tends to trigger an incredulous response as it is
38  unreasonable to consider that all Agents, loan agents, appraisers, and other ordinary
39  people, just doing what they have been trained to do, are out to swindle the poor
40  unsuspecting borrower.

41  The facts Petitioner is prepared to prove are that Petitioner has been harmed by fraud
42  committed by people acting in concert and collusion, one with the other.  Petitioner has no
43  reason to believe that the Agent, loan officer, appraiser, and others were consciously aware
44  that what they were doing was part of an ongoing criminal conspiracy, only that it was,
45  and they, at the very least, kept themselves negligently uninformed of the wrongs they
46  were perpetrating.  Petitioner maintains the real culprit is the system itself, including the
47  courts, for failure to strictly enforce the consumer protection laws.

48                     **CAREFULLY CRAFTED CRIMINAL CONNIVANCE**
49                        *(General State of the Real Estate Industry)*

50      ***THE BEST OF INTENTIONS***

51  Prior to the 1980's and 1990's ample government protections were in place to protect
52  consumers and the lending industry from precisely the disaster we now experience.
53  During President Clinton's administration, under the guise of making housing available to

54  the poor, primary protections were relaxed which had the effect of releasing <u>the</u>
55  <u>unscrupulous on the unwary</u>.

56  <u>Prior to deregulation in the 1980's, lenders created loans for which they held and assumed</u>
57  <u>the risk.   Consequently,</u> Americans were engaged in safe and stable home mortgages.
58  With the protections removed, the <u>unscrupulous lenders</u> swooped in and, instead of
59  making loans available to the poor, used the opportunity to convince the unsophisticated
60  American public to do something that had been <u>traditionally</u> taboo; home <u>buyers</u> were
61  convinced to speculate with their homes, <u>their most important investment</u>.

62   Bank of America Home Loans , Ameriquest, Countrywide, and many others swooped in
63  and convinced Americans to sell their homes, get out of the<u>ir</u> safe mortgage agreements,
64  and speculate with the equity <u>they had gained</u> by purchasing homes they could not afford.
65  Lenders created loans intended to fail as, under the newly crafted system, the Lender
66  profited more from a mortgage default than from a stable loan.

67  Companies cropped up who called themselves banks when, in fact, they were only either
68  subsidiaries of banks, or unaffiliated companies that were operated for the purpose of
69  creating and selling promissory notes.  As will be demonstrated, these companies then
70  profited from the failure of the underlying loans.

71  ***HOW IT WORKS***

72  Briefly, how it works is this, the Lender would secure a large loan from a large bank,
73  convert that loan into 20 and 30 year mortgages <u>and </u>then sell the promise to pay to an
74  investor.

75  People would set up mortgage companies buy securing a large loan from one of the major
76  banks, then convert that loan into 20 and 30 year mortgages.  In order to accomplish this
77  an Agent would contract with a seller to find a buyer, bring both seller and buyer to a
78  lender who would secure the title from the seller using the <u>borrowed bank</u> funds for that
79  <u>purpose, and then</u> trade the title to the buyer in exchange for a promissory note.

80  The lender then <u>creates a</u> 20 or 30 year mortgage with money the lender must repay within
81  6 months.  As soon as the closing is consummated, the promissory note is sold to an
82  investor pool.

83  Using the instant case as an example, a $175,500.00 note at 8.7072%%  interest over 30
84  years will produce $154,589.43     The lender can then offer <u>to the investor </u>the security

85   instrument (promissory note) at say 50% of it's future value.  The investor will, over the
86   life of the note, less approximately 3.00% servicing fees, realize $243,147.76 .  The lender
87   can then pay back the bank and retain a handsome profit in the amount of $82,687.82.  The
88   lender, however, is not done with the deal.

89   The lender signed over the promissory note to the investor at the time of the trade, but did
90   not sign over the lien document (mortgage or deed of trust).  The State of Kansas Supreme
91   Court addressed this issue and stated that such a transaction was certainly legal.  However,
92   it created a fatal flaw as the holder of the lien document, at time of sale of the security
93   instrument, received consideration in excess of the lien amount.  Since the lien holder
94   received consideration, he could not be harmed.   Therefore the lien became an
95   unenforceable document.

96   This begs the question: if keeping the lien would render it void, why would the lender not
97   simply transfer the lien with the promissory note?  The reason is because the lender will
98   hold the lien for three years, file an Internal Revenue Service Form 1099a, claim the full
99   amount of the lien as abandoned funds, and deduct the full amount from the lender's tax
100   liability.  The lender, by this maneuver, gets consideration a second time.  And still the
101   lender is not done profiting from the deal.

102   After sale of the promissory note, the lender remains as the servicer for the investor.  The
103   lender will receive 3% of each payment the lender collects and renders to the investor
104   pool. However, if the payment is late, the lender is allowed to assess an extra 5% and keep
105   that amount.  Also, if the loan defaults, the lender stands to gain thousands for handling the
106   foreclosure.

107   The lender stands to profit more from a note that is overly expensive, than from a good
108   stable loan.   And where, you may ask, does all this profit come from?  It comes from the
109   equity the borrower had built up in the home.  And still the lender is not finished profiting
110   from the deal.

111   Another nail was driven in the American financial coffin when on the last day Congress
112   was in session in 2000 when restrictions that had been in place since the economic
113   collapse of 1907 were removed.   Until 1907  investors were allowed to bet on stocks
114   without actually buying them.  This unbridled speculation led directly to an economic
115   collapse.  As a result the legislature banned the practice, until the year 2000.  In 2000 the
116   unscrupulous lenders got their way on the last day of the congressional session. Congress

117    removed the restriction banning derivatives and again allowed the practice, this time
118    taking only 8 years to crash the stock market.    This practice allowed the lender to profit
119    further from the loan by betting on the failure of the security instrument he had just sold to
120    the unwary investor, thus furthering the purpose of the lender to profit from both the
121    borrower (consumer) and the investor.

122    The failure of so many loans recently resulted in a seven hundred and fifty billion dollar
123    bailout at the expense of the taxpayer.    The unsuspecting consumer was lulled into
124    accepting the pronouncements of the lenders, appraisers, underwriters, and trustees as all
125    were acting under the guise of government regulation and, therefore, the borrower had
126    reason to expect good and fair dealings from all. Unfortunately, the regulations in place to
127    protect the consumer from just this kind of abuse were simply being ignored.

128    The loan origination fee from the HUD1 settlement statement is the finder's fee paid for
129    the referral of the client to the lender by a person acting as an agent for the borrower.
130    Hereinafter, the person or entity who receives any portion of the yield spread premium, or
131    a commission of any kind consequent to securing the loan agreement through from the
132    borrower will be referred to as "Agent." The fee, authorized by the consumer protection
133    law is restricted to 1% of the principal of the note.  It was intended that the Agent, when
134    seeking out a lender for the borrower, would seek the best deal for his client rather than
135    who would pay him the most.  That was the intent, but not the reality.  The reality is that
136    Agents never come away from the table with less than 2% or 3% of the principal.  This is
137    accomplished by undisclosed fees to the Agent in order to induce the Agent to breach his
138    fiduciary duty to the borrower and convince the borrower to accept a more expensive loan
139    product than the borrower qualifies for.  This will generate more profits for the lender and,
140    consequently, for the Agent.

141    It is a common practice for lenders to coerce appraisers to give a higher appraisal than is
142    the fair market price.  This allows the lender to increase the cost of the loan product and
143    give the impression that the borrower is justified in making the purchase.

144    The lender then charges the borrower an underwriting fee in order to convince the
145    borrower that someone with knowledge has gone over the conditions of the note and
146    certified that they meet all legal criteria.  The trustee, at closing, participates actively in the
147    deception of the borrower by placing undue stress on the borrower to sign the large stack
148    of paperwork without reading it.  The trustee is, after all, to be trusted and has been paid to

149  insure the transaction.  This trust is systematically violated for the purpose of taking unfair
150  advantage of the borrower.   The entire loan process is a carefully crafted contrive
151  connivance designed and intended to induce the unsophisticated borrower into accepting a
152  loan product that is beyond the borrowers means to repay.  With all this, it should be a
153  surprise to no one that this country is having a real estate crisis.

154                        **PETITIONER WILL PROVE THE FOLLOWING**
155  Petitioner is prepared to prove, by a preponderance of evidence that:

156  • Lender has no legal standing to bring collection or foreclosure claims against the
157     property;

158  • Lender is not a real party in interest in any contract which can claim a collateral
159     interest in the property;

160  • even if Lender were to prove up a contract to which Lender had standing to enforce
161     against Petitioner, no valid lien exists which would give Lender a claim against the
162     property;

163  • even if Lender were to prove up a contract to which Lender had standing to enforce
164     against Petitioner,  said contract was fraudulent in its creation as endorsement was
165     secured by acts of negligence, common law fraud, fraud by non-disclosure, fraud in
166     the inducement, fraud in the execution, usury, and breaches of contractual and
167     fiduciary obligations by Mortgagee or "Trustee" on the Deed of Trust, "Mortgage
168     Agents," "Loan Originators," "Loan Seller," "Mortgage Aggregator," "Trustee of
169     Pooled Assets,"  "Trustee or officers of Structured Investment Vehicle,"
170     "Investment Banker," "Trustee of Special Purpose Vehicle/Issuer of Certificates of
171     'Asset-Backed Certificates,'" "Seller of 'Asset-Backed' Certificates (shares or
172     bonds)," "Special Servicer" and Trustee, respectively, of certain mortgage loans
173     pooled together in a trust fund;

174  • Defendants have concocted a carefully crafted connivance wherein Lender
175     conspired with Agents, et al, to strip Petitioner of Petitioner's equity in the property
176     by inducing Plaintiff to enter into a predatory loan inflated loan product;

177  • Lender received unjust enrichment in the amount of 5% of each payment made late
178     to Lender while Lender and Lender's assigns acted as servicer of the note;

PRELIMINARY INJUNCTION                6 of 26

179    • Lender and Lender's assigns, who acted as servicer in place of Lender, profited by
180        handling the foreclosure process on a contract Lender designed to have a high
181        probability of default;

182    • Lender intended to defraud Investor by converting the promissory note into a
183        security instrument and selling same to Investor;

184    • Lender intended to defraud Investor and the taxpayers of the United States by
185        withholding the lien document from the sale of the promissory note in order that
186        Lender could then hold the lien for three years, then prepare and file Internal
187        Revenue Form 1099a and falsely claim the full lien amount as abandoned funds
188        and deduct same from Lender's income tax obligation;

189    • Lender defrauded backers of derivatives by betting on the failure of the promissory
190        note the lender designed to default;

191    • participant Defendants, et al, in the securitization scheme described herein have
192        devised business plans to reap millions of dollars in profits at the expense of
193        Petitioner and others similarly situated.

194                              **PETITIONER SEEKS REMEDY**
195    In addition to seeking compensatory, consequential and other damages, Petitioner seeks
196    declaratory relief as to what (if any) party, entity or individual or group thereof is the
197    owner of the promissory note executed at the time of the loan closing, and whether the
198    Deed of Trust (Mortgage) secures any obligation of the Petitioner, and a Mandatory
199    Injunction requiring re-conveyance of the subject property to the Petitioner or, in the
200    alternative a Final Judgment granting Petitioner Quiet Title in the subject property.

201    ***PETITIONER HAS BEEN HARMED***

202    Petitioner has suffered significant harm and detriment as a result of the actions of Defendants.

203    Such harm and detriment includes economic and non-economic damages, and injuries to
204    Petitioner's mental and emotional health and strength, all to be shown according to proof at trial.

205    In addition, Petitioner will suffer grievous and irreparable further harm and detriment unless the
206    equitable relief requested herein is granted.

PRELIMINARY INJUNCTION              7 of 26

207                              **STATEMENT OF CLAIM**

208        *DEFENDANTS LACK STANDING*

209            **No evidence of Contractual Obligation**

210    Defendants claim a controversy based on a contractual violation by Petitioner but have failed to

211    produce said contract.  Even if Defendants produced evidence of the existence of said contract in

212    the form of an allegedly accurate photocopy of said document, a copy is only hearsay evidence

213    that a contract actually existed at one point in time.  A copy, considering the present state of

214    technology, could be easily altered.  As Lender only created one original and that original was

215    left in the custody of Lender, it was imperative that Lender protect said instrument.

216    In as much as the Lender is required to present the original on demand of Petitioner, there can be

217    no presumption of regularity when the original is not so produced.   In as much as Lender has

218    refused Petitioner's request of the chain of custody of the security instrument in question by

219    refusing to identify all current and past real parties in interest, there is no way to follow said

220    chain of custody to insure, by verified testimony, that no alterations to the original provisions in

221    the contract have been made.    Therefore, the alleged copy of the original is only hearsay

222    evidence that an original document at one time existed.  Petitioner maintains that, absent

223    production of admissible evidence of a contractual obligation on the part of Petitioner,

224    Defendants are without standing to invoke the subject matter jurisdiction of the court.

225            **No Proper Evidence of Agency**

226    Defendants claim agency to represent the principal in a contractual agreement involving

227    Petitioner, however, Defendants have failed to provide any evidence of said agency other than a

228    pronouncement that agency has been assigned by some person, the true identity and capacity of

229    whom has not been established.  Defendants can hardly claim to be agents of a principal then

230    refuse to identify said principal.  All claims of agency are made from the mouth of the agent with

231    no attempt to provide admissible evidence from the principal.

232    Absent proof of agency, Defendants lack standing to invoke the subject matter jurisdiction of the

233    court.

234        **Special Purpose Vehicle**

235    Since the entity now claiming agency to represent the holder of the security instrument is not the

236    original lender, Petitioner has reason to believe that the promissory note, upon consummation of

237    the contract, was converted to a security and sold into a special purpose vehicle and now resides

238    in a Real Estate Mortgage Investment Conduit (REMIC)  as defined by the Internal Revenue

239    Code and as such, cannot be removed from the REMIC as such would be a prohibited

240    transaction.   If the mortgage was part of a special purpose vehicle and was removed on

241    consideration of foreclosure, the real party in interest would necessarily be the trustee of the

242    special purpose vehicle.  Nothing in the pleadings of Defendants indicates the existence of a

243    special purpose vehicle, and the lack of a proper chain of custody documentation gives Petitioner

244    cause to believe defendant is not the proper agent of the real party in interest.

245        ***CRIMINAL CONSPIRACY AND THEFT***

246    Defendants, by and through Defendant's Agents, conspired with other Defendants, et al, toward

247    a criminal conspiracy to defraud Petitioner.  Said conspiracy but are not limited to acts of

248    negligence, breach of fiduciary duty, common law fraud, fraud by non-disclosure, and tortuous

249    acts of conspiracy and theft, to include but not limited to, the assessment of improper fees to

250    Petitioner by Lender, which were then used to fund the improper payment of commission fees to

251    Agent in order to induce Agent to violate Agent's fiduciary duty to Petitioner.

252        ***AGENT PRACTICED UP-SELLING***

253    By and through the above alleged conspiracy, Agent practiced up-selling to Petitioner.  In so

254    doing, Agent violated the trust relationship actively cultivated by Agent and supported by fact

255    that Agent was licensed by the state.  Agent further defrauded Petitioner by failing to disclose

256    Agent's conspiratorial relationship to Lender,  Agent violated Agent's fiduciary duty to

257    Petitioner and the duty to provide fair and honest services, through a series of carefully crafted

258    connivances, wherein Agent proactively made knowingly false and misleading statements of

259    alleged fact to Petitioner, and by giving partial disclosure of facts intended to directly mislead

260    Petitioner for the purpose of inducing Petitioner to make decisions concerning the acceptance of

261    a loan product offered by the Lender.  Said loan product was more expensive than Petitioner

262    could legally afford. Agent acted with full knowledge that Petitioner would have made a

263    different decision had Agent given complete disclosure.

PRELIMINARY INJUNCTION        9 of 26

264    ***FRAUDULENT INDUCEMENT***

265    Lender maliciously induced Petitioner to accept a loan product, Lender knew, or should have
266    known, Petitioner could not afford in order to unjustly enrich Lender.

267    ***EXTRA PROFIT ON SALE OF PREDATORY LOAN PRODUCT***

268    Said more expensive loan product was calculated to produce a higher return when sold as a
269    security to an investor who was already waiting to purchase the loan as soon as it could be
270    consummated.

271    **Extra Commission for Late Payments**

272    Lender acted with deliberate malice in order to induce Petitioner to enter into a loan agreement
273    that Lender intended Petitioner would have difficulty paying.  The industry standard payment to
274    the servicer for servicing a mortgage note is 3% of the amount collected.  However, if the
275    borrower is late on payments, a 5% late fee is added and this fee is retained by the servicer.
276    Thereby, the Lender stands to receive more than double the regular commission on collections if
277    the borrower pays late.

278    **Extra Income for Handling Foreclosure**

279    Lender acted with deliberate malice in order to induce petitioner to enter into a loan agreement
280    on which Lender intended petitioner to default.  In case of default, the Lender, acting as servicer,
281    receives considerable funds for handling and executing the foreclosure process.

282    **Credit Default Swap Gambling**

283    Lender, after deliberately creating a loan intended to default is now in a position to bet on credit
284    default swap, commonly referred to as a derivative as addressed more fully below.  Since Lender
285    designed the loan to fail, betting on said failure is essentially a sure thing.

286    ***LENDER ATTEMPTING TO FRAUDULENTLY COLLECT ON VOID LIEN***

287    Lender sold the security instrument after closing and received consideration in an amount in
288    excess of the lien held by Lender.  Since Lender retained the lien document upon the sale of the
289    security instrument, Lender separated the lien from said security instrument, creating a fatal and
290    irreparable flaw.

PRELIMINARY INJUNCTION            10 of 26

291   When Lender received consideration while still holding the lien and said consideration was in
292   excess of the amount of the lien, Lender was in a position such that he could not be harmed and
293   could not gain standing to enforce the lien.  The lien was, thereby, rendered void.

294   Since the separation of the lien from the security instrument creates such a considerable concern,
295   said separation certainly begs a question: "Why would the Lender retain the lien when selling the
296   security instrument?"

297   When you follow the money the answer is clear.  The Lender will hold the lien for three years,
298   then file an IRS Form 1099a and claim the full amount of the lien as abandoned funds and deduct
299   the full amount from Lender's tax liability, thereby, receiving consideration a second time.

300   Later, in the expected eventuality of default by petitioner, Lender then claimed to transfer the
301   lien to the holder of the security, however, the lien once satisfied, does not gain authority just
302   because the holder, after receiving consideration, decides to transfer it to someone else.

303   ### *LENDER PROFIT BY CREDIT DEFAULT SWAP DERIVATIVES*

304   Lender further stood to profit by credit default swaps in the derivatives market, by way of inside
305   information that Lender had as a result of creating the faulty loans sure to default.  Lender was
306   then free to invest on the bet that said loan would default and stood to receive unjust enrichment
307   a third time.  This credit default swap derivative market scheme is almost totally responsible for
308   the stock market disaster we now experience as it was responsible for the stock market crash in
309   1907.

310   ### *LENDER CHARGED FALSE FEES*

311   Lender charged fees to Petitioner that were in violation of the limitations imposed by the Real
312   Estate Settlement Procedures Act as said fees were simply contrived and not paid to a third party
313   vendor.

314   Lender charged other fees that were a normal part of doing business and should have been
315   included in the finance charge.

316   Below is a listing of the fees charged at settlement.  Neither at settlement, nor at any other time
317   did Lender or Trustee provide documentation to show that the fees herein listed were valid,
318   necessary, reasonable, and proper to charge Petitioner.

PRELIMINARY INJUNCTION                    11 of 26

| 804 | Doc Prep Fee | $325.00 |
| 805 | Verification Fee | $25.00 |
| 806 | Flood Determination Fee | $7.00 |
| 807 | Life of Loan Flood Chart | $5.00 |
| 808 | Application Fee | $315.00 |
| 809 | Tax Service Fee | $75.00 |
| 810 | Underwriting Fee | $325.00 |
| 901 | Interest from 1/30/07 to 2/1/07 @ $36.0618/day ( 2 days) | $72.12 |
| 903 | Hazard Insurance Premium | $486.72 |
| 1001 | Hazard Insurance | $121.68 |
| 1004 | County Property Taxes | $16.67 |
| 1101 | Settlement fee | $251.75 |
| 1103 | Shipping/Handling | $22.00 |
| 1104 | Wire Fee | $20.00 |
| 1105 | eDoc Fee | $25.00 |
| 1109 | Lender's Coverage | $373.10 |
| 1111 | Recording Service Charge | $25.00 |
| 1112 | Endorsement Fee | $50.00 |

319  Debtor is unable to determine whether or not the above fees are valid in accordance with the

320  restrictions provided by the various consumer protection laws.  Therefore, please provide; a

321  complete billing from each vendor who provided the above listed services; the complete contact

322  information for each vendor who provided a billed service; clearly stipulate as to the specific

323  service performed; a showing that said service was necessary; a showing that the cost of said

324  service is reasonable; a showing of why said service is not a regular cost of doing business that

325  should rightly be included in the finance charge.

326  The above charges are hereby disputed and deemed unreasonable until such time as said charges

327  have been demonstrated to be reasonable, necessary, and in accordance with the limitations and

328  restrictions included in any and all laws, rules, and regulations intended to protect the consumer.

329  In the event lender fails to properly document the above charges, borrower will consider same as

330  false charges.  The effect of the above amounts that borrower would pay over the life of the note

331  will be an overpayment of $171,246.15  This amount will be reduced by the amount of items

332  above when said items are fully documented.

333  ***RESPA PENALTY***

334  From a cursory examination of the records, with the few available, the apparent RESPA

335  violations are as follows: Good Faith Estimate not within limits, No HUD-1 Booklet, Truth In

336  Lending Statement not within limits compared to Note, Truth in Lending Statement not timely

337  presented, HUD-1 not presented at least one day before closing, No Holder Rule Notice in Note,

338  No 1st Payment Letter.

PRELIMINARY INJUNCTION              12 of 26

339    The closing documents included no signed and dated : Financial Privacy Act Disclosure; Equal
340    Credit Reporting Act Disclosure; notice of right to receive appraisal report; servicing disclosure
341    statement; borrower's Certification of Authorization; notice of credit score; RESPA servicing
342    disclosure letter; loan discount fee disclosure; business insurance company arrangement
343    disclosure; notice of right to rescind.

344    The courts have held that the borrower does not have to show harm to claim a violation of the
345    Real Estate Settlement Procedures Act, as the Act was intended to insure strict compliance. And,
346    in as much as the courts are directed to assess a penalty of no less than two hundred dollars and
347    no more than two thousand, considering the large number enumerated here, it is reasonable to
348    consider that the court will assess the maximum amount for each violation.

349    Since the courts have held that the penalty for a violation of RESPA accrues at consummation of
350    the note, borrower has calculated that, the number of violations found in a cursory examination
351    of the note, if deducted from the principal, would result in an overpayment on the part of the
352    borrower, over the life of the note, of $298,405.25.

353    If the violation penalty amounts for each of the unsupported fees listed above are included, the
354    amount by which the borrower would be defrauded is $272,656.59

355    Adding in RESPA penalties for all the unsupported settlement fees along with the TILA/Note
356    variance, it appears that lender intended to defraud borrower in the amount of $913,554.30

357    ### *LENDER CONSPIRED WITH APPRAISER*

358    Lender, in furtherance of the above referenced conspiracy, conspired with appraiser for the
359    purpose of preparing an appraisal with a falsely stated price, in violation of appraiser's fiduciary
360    duty to Petitioner and appraiser's duty to provide fair and honest services, for the purpose of
361    inducing Petitioner to enter into a loan product that was fraudulent toward the interests of
362    Petitioner.

363    ### *LENDER CONSPIRED WITH TRUSTEE*

364    Lender conspired with the trust Agent at closing to create a condition of stress for the specific
365    purpose of inducing Petitioner to sign documents without allowing time for Petitioner to read and
366    fully understand what was being signed.

367   The above referenced closing procedure was a carefully crafted connivance, designed and
368   intended to induce Petitioner, through shame and trickery, in violation of trustee's fiduciary duty
369   to Petitioner and the duty to provide fair and honest services, to sign documents that Petitioner
370   did not have opportunity to read and fully understand, thereby, denying Petitioner full disclosure
371   as required by various consumer protection statutes.

372   ### *DECEPTIVE ADVERTISING AND OTHER UNFAIR BUSINESS PRACTICES*

373   In the manner in which Defendants have carried on their business enterprises, they have engaged
374   in a variety of unfair and unlawful business practices prohibited by *15 USC Section 45* et seq.
375   (Deceptive Practices Act).

376   Such conduct comprises a pattern of business activity within the meaning of such statutes, and
377   has directly and proximately caused Petitioner to suffer economic and non-economic harm and
378   detriment in an amount to be shown according to proof at trial of this matter.

379   ### *EQUITABLE TOLLING FOR TILA AND RESPA*

380   The Limitations Period for Petitioners' Damages Claims under TILA and RESPA should be
381   Equitably Tolled due to the DEFENDANTS' Misrepresentations and Failure to Disclose.

382   Any claims for statutory and other money damages under the Truth in Lending Act *(15 U.S.C. §*
383   *1601,* et. seq.) and under the Real Estate Settlement Procedures Act *(12 U.S.C. § 2601* et. seq.)
384   are subject to a one-year limitations period; however, such claims are subject to the equitable
385   tolling doctrine. The Ninth Circuit has interpreted the TILA limitations period in § 1640(e) as
386   subject to equitable tolling. In *King v. California, 784 F.2d 910 (9th Cir.1986),* the court held
387   that given the remedial purpose of TILA, the limitations period should run from the date of
388   consummation of the transaction, but that "the doctrine of equitable tolling may, in appropriate
389   circumstances, suspend the limitations period until the borrower discovers or has reasonable
390   opportunity to discover the fraud or nondisclosures that form the basis of the TILA action." *King*
391   *v. California, 784 F.2d 910, 915 9t*h Cir. 1986).

392   Likewise, while the Ninth Circuit has not taken up the question whether *12 U.S.C. § 2614,* the
393   anti-kickback provision of **RESPA,** is subject to equitable tolling, other Courts have, and hold
394   that such limitations period may be equitably tolled. The Court of Appeals for the District of
395   Columbia held that § 2614 imposes a strictly jurisdictional limitation, *Hardin v. City Title &*

396    *Escrow Co., 797 F.2d 1037, 1039-40 (D.C. Cir. 1986),* while the Seventh Circuit came to the
397    opposite conclusion. *Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1164 (7th*
398    *Cir. 1997).* District courts have largely come down on the side of the Seventh Circuit in holding
399    that the one-year limitations period in § 2614 is subject to equitable tolling. See, e.g., *Kerby v.*
400    *Mortgage Funding Corp., 992 F.Supp. 787, 791-98 (D.Md.1998); Moll v. U.S. Life Title Ins. Co.,*
401    *700 F.Supp. 1284, 1286-89 (S.D.N.Y.1988).* Importantly, the Ninth Circuit, as noted above, has
402    interpreted the TILA limitations period in *15 U.S.C. § 1640* as subject to equitable tolling; the
403    language of the two provisions is nearly identical. *King v. California, 784 F.2d at 914.* While not
404    of precedential value, this Court has previously found both the TILA and **RESPA** limitations
405    periods to be subject to equitable tolling. *Blaylock v. First American Title Ins. Co., 504*
406    *F.Supp.2d 1091,* (W.D. Wash. 2007). 1106-07.

407    The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on excusable delay
408    by the Petitioner," and inquires whether "a reasonable Petitioner would ... have known of the
409    existence of a possible claim within the limitations period." *Johnson v. Henderson, 314 F.3d*
410    *409, 414 (9th Cir.2002), Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir.2000).*
411    Equitable tolling focuses on the reasonableness of the Petitioner's delay and does not depend on
412    any wrongful conduct by the Defendants. Santa Maria. at 1178.

413    ### *BUSINESS PRACTICES CONCERNING DISREGARDING OF UNDERWRITING*
414    ### *STANDARDS*

415    Traditionally, Lenders required borrowers seeking mortgage loans to document their income and
416    assets by, for example, providing W-2 statements, tax returns, bank statements, documents
417    evidencing title, employment information, and other information and documentation that could
418    be analyzed and investigated for its truthfulness, accuracy, and to determine the borrower's
419    ability to repay a particular loan over both the short and long term. Defendants deviated from and
420    disregarded these standards, particularly with regard to its riskier and more profitable loan
421    products.

422    **Low-Documentation/No-Documentation Loans.**

423    Driven by its desire for market share and a perceived need to maintain competitiveness with the
424    likes of Countrywide, Defendants began to introduce an ever increasing variety of low and no
425    documentation loan products, including the HARMs and HELOCs described hereinabove, and
426    began to deviate from and ease its underwriting criteria, and then to grant liberal exceptions to

PRELIMINARY INJUNCTION              15 of 26

427   the already eased underwriting standards to the point of disregarding such standards. This
428   quickened the loan origination process, allowing for the generation of more and more loans
429   which could then be resold and/or securitized in the secondary market.

430   Defendants marketed no-documentation/low-documentation loan programs that included
431   HARMs and HELOCs, among others, in which loans were given based on the borrower's "stated
432   income" or "stated assets" (SISA) neither of which were verified. Employment was verbally
433   confirmed, if at all, but not further investigated, and income, if it was even considered as a factor,
434   was to be roughly consistent with incomes in the types of jobs in which the borrower was
435   employed. When borrowers were requested to document their income, they were able to do so
436   through information that was less reliable than in a full-documentation loan.

437   For stated income loans, it became standard practice for loan processors, loan officers and
438   underwriters to rely on www.salary.com to see if a stated income was reasonable.  Such stated
439   income loans, emphasizing loan origination from a profitability standpoint at the expense of
440   determining the ability of the borrower to repay the loan from an underwriting standpoint,
441   encouraged the overstating and/or fabrication of income.

442   **Easing of Underwriting Standards**

443   In order to produce more loans that could be resold in the secondary mortgage market,
444   Defendants also relaxed, and often disregarded, traditional underwriting standards used to
445   separate acceptable from unacceptable risk. Examples of such relaxed standards were reducing
446   the base FICO score needed for a SISA loan.

447   Other underwriting standards that Defendants relaxed included qualifying interest rates (the rate
448   used to determine whether borrowers can afford the loan), loan to value ratios (the amount of
449   loan(s) compared to the appraised/sale price of the property, whichever is lower), and debt-to-
450   income ratios (the amount of monthly income compared to monthly debt service payments and
451   other monthly payment obligations.

452   With respect to HARMS, Defendants underwrote loans without regard to the borrower's long-
453   term financial circumstances, approving the loan based on the initial fixed rate without taking
454   into account whether the borrower could afford the substantially higher payment that would
455   inevitably be required during the remaining term of the loan.

PRELIMINARY INJUNCTION              16 of 26

456   With respect to HELOCs, Defendants underwrote and approved such loans based only on the
457   borrower's ability to afford the interest-only payment during the initial draw period of the loan,
458   rather than on the borrower's ability to afford the subsequent, fully amortized principal and
459   interest payments.

460   As Defendants pushed to expand market share, they eased other basic underwriting standards.
461   For example, higher loan-to-value (LTV) and combined loan-to-value (CLTV) ratios were
462   allowed. Likewise, higher debt-to-income (DTI) ratios were allowed. At the same time that they
463   eased underwriting standards the Defendants also were encouraging consumers to go further into
464   debt in order to supply the very lucrative aftermarket of mortgage backed securities.  The relaxed
465   underwriting standards created the aftermarket supply they needed. As a result, the Defendants
466   made it easy for the unwary consumer to take on more debt than he could afford by encouraging
467   unsound financial practices, all the while knowing defaults would occur more and more
468   frequently as the credit ratios of citizens reached the limit of the new relaxed underwriting
469   standards.

470   Defendants knew, or in the exercise of reasonable care should have known, from its own
471   underwriting guidelines industry standards that it was accumulating and selling/reselling risky
472   loans that were likely to end up in default. However, as the pressure mounted to increase market
473   share and originate more loans, Defendants began to grant "exceptions" even to its relaxed
474   underwriting guidelines. Such was the environment that loan officers and underwriters were,
475   from time to time, placed in the position of having to justify why they did not approve a loan that
476   failed to meet underwriting criteria.

477   **Risk Layering**

478   Defendants compromised its underwriting even further by risk layering, i.e. combining high risk
479   loans with one or more relaxed underwriting standards.

480   Defendants knew, or in the exercise of reasonable care should have known, that layered risk
481   would increase the likelihood of default. Among the risk layering Defendants engaged in were
482   approving HARM loans with little to no down payment, little to no documentation, and high
483   DTI/LTV/CLTV ratios. Despite such knowledge, Defendants combined these very risk factors in
484   the loans it promoted to borrowers.

PRELIMINARY INJUNCTION              17 of 26

485   Loan officers and mortgage Agents aided and abetted this scheme by working closely with other

486   mortgage Lenders/mortgage bankers to increase loan originations, knowing or having reason to

487   believe that Defendants and other mortgage Lenders/mortgage bankers with whom they did

488   business ignored basic established underwriting standards and acted to mislead the borrower, all

489   to the detriment of the borrower and the consumer of loan products..

490   Petitioner is informed and believe, and on that basis allege, that Defendants, and each of them,

491   engaged and/or actively participated in, authorized, ratified, or had knowledge of, all of the

492   business practices described above in paragraphs 30-42 of this Complaint

493   ***UNJUST ENRICHMENT***

494   Petitioner is informed and believes that each and all of the Defendants received a benefit at

495   Petitioner's expense, including but not limited to the following: To the Agent, commissions,

496   yield spread premiums, spurious fees and charges, and other "back end" payments in amounts to

497   be proved at trial; To the originating Lender, commissions, incentive bonuses, resale premiums,

498   surcharges and other "back end" payments in amounts to be proved at trial; To the investors,

499   resale premiums, and high rates of return; To the servicers including EMS, servicing fees,

500   percentages of payment proceeds, charges, and other "back end" payments in amounts to be

501   proved at trial; To all participants, the expectation of future revenues from charges, penalties and

502   fees paid by Petitioner when the unaffordable LOAN was foreclosed or refinanced.

503   By their misrepresentations, omissions and other wrongful acts alleged heretofore, Defendants,

504   and each of them, were unjustly enriched at the expense of Petitioner, and Petitioner was unjustly

505   deprived, and is entitled to restitution in the amount of $913,554.30

506   ***CLAIM TO QUIET TITLE.***

507   Petitioner properly averred a claim to quiet title. Petitioner included both the street address, and

508   the Assessor's Parcel Number for the property. Petitioner has set forth facts concerning the title

509   interests of the subject property. Moreover, as shown above, Petitioner's claims for rescission

510   and fraud are meritorious. As such, Petitioner's bases for quiet title are meritorious as well.

511   Defendants have no title, estate, lien, or interest in the Subject Property in that the purported

512   power of sale contained in the Deed of Trust is of no force or effect because Defendants' security

513   interest in the Subject Property has been rendered void and that the Defendants are not the holder

PRELIMINARY INJUNCTION            18 of 26

514   in due course of the Promissory Note. Moreover, because Petitioner properly pled all Defendants'

515   involvement in a fraudulent scheme, all Defendants are liable for the acts of its co-conspirators,

516   "a Petitioner is entitled to damages from those Defendants who concur in the tortuous

517   scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortgage Co., 24 Cal.*

518   *3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); Novartis Vaccines and Diagnostics, Inc.*

519   *v. Stop Huntingdon Animal Cruelty USA, Inc., 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d*

520   *27 (1st Dist. 2006); Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 47 Cal.*

521   *Rptr. 2d 752 (2d Dist. 1995).*

522   ### SUFFICIENCY OF PLEADING

523   Petitioner has sufficiently pled that relief can be granted on each and every one of the

524   Complaint's causes of action. A complaint should not be dismissed "unless it appears beyond

525   doubt that the Petitioner can prove no set of facts in support of Petitioner claim which would

526   entitle Petitioner to relief." *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* "All

527   allegations of material fact in the complaint are taken as true and construed in the light most

528   favorable to Petitioner." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir. 1996).*

529   Attendant, the Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc.

530   8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal

531   theories, and seeks remedies to which Petitioner is entitled. *Balistreri v. Pacifica Police Dept., 901 F.2d*

532   *696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).* Moreover, the legal

533   conclusions in the Complaint can and should be drawn from the facts alleged, and, in turn, the court

534   should accept them as such. *Clegg v. Cult Awareness Network, 18 F.3d 752 (9th Cir, 1994).* Lastly,

535   Petitioner's complaint contains claims and has a probable validity of proving a "set of facts" in support of

536   their claim entitling them to relief. *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore,

537   relief as requested herein should be granted.

538   ### CAUSES OF ACTION

539   ### BREACH OF FIDUCIARY DUTY

540   Defendants Agent, appraiser, trustee, Lender, et al, and each of them, owed Petitioner a fiduciary

541   duty of care with respect to the mortgage loan transactions and related title activities involving

542   the Trust Property.

543   Defendants breached their duties to Petitioner by, *inter alia,* the conduct described above. Such
544   breaches included, but were not limited to, ensuring their own and Petitioners' compliance with
545   all applicable laws governing the loan transactions in which they were involved, including but
546   not limited to, TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under.

547   Defendant's breaches of said duties were a direct and proximate cause of economic and non-
548   economic harm and detriment to Petitioner(s).

549   Petitioner did suffer economic, non-economic harm, and detriment as a result of such conduct,
550   all to be shown according to proof at trial of this matter.

551       ***CAUSE OF ACTION - NEGLIGENCE/NEGLIGENCE PER SE***

552   Defendants owed a general duty of care with respect to Petitioners, particularly concerning their
553   duty to properly perform due diligence as to the loans and related transactional issues described
554   hereinabove.

555   In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations
556   X and Z promulgated there under to, among other things, provide proper disclosures concerning
557   the terms and conditions of the loans they marketed, to refrain from marketing loans they knew
558   or should have known that borrowers could not afford or maintain, and to avoid paying undue
559   compensation such as "yield spread premiums" to mortgage Agents and loan officers.

560   Defendants knew or in the exercise of reasonable care should have known, that the loan
561   transactions involving Petitioner and other persons similarly situated were defective, unlawful,
562   violative of federal and state laws and regulations, and would subject Petitioner to economic and
563   non-economic harm and other detriment.

564   Petitioner is among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and
565   Z promulgated there under were intended and designed to protect, and the conduct alleged
566   against Defendants is the type of conduct and harm which the referenced statutes and regulations
567   were designed to deter.

568   As a direct and proximate result of Defendant's negligence, Petitioner suffered economic and
569   non-economic harm in an amount to be shown according to proof at trial.

PRELIMINARY INJUNCTION          20 of 26

570    **AGENT: COMMON LAW FRAUD**

571    If any Agents' misrepresentations made herein were not intentional, said misrepresentations were

572    negligent. When the Agents made the representations alleged herein, he/she/it had no reasonable

573    ground for believing them to be true.

574    Agents made these representations with the intention of inducing Petitioner to act in reliance on

575    these representations in the manner hereafter alleged, or with the expectation that Petitioner

576    would so act.

577    Petitioner is informed and believes that Agent et al, facilitated, aided and abetted various Agents

578    in their negligent misrepresentation, and that various Agents were negligent in not implementing

579    procedures such as underwriting standards oversight that would have prevented various Agents

580    from facilitating the irresponsible and wrongful misrepresentations of various Agents to

581    Defendants.

582    Petitioner is informed and believes that Agent acted in concert and collusion with others named

583    herein in promulgating false representations to cause Petitioner to enter into the LOAN without

584    knowledge or understanding of the terms thereof.

585    As a proximate result of the negligent misrepresentations of Agents as herein alleged, the

586    Petitioner sustained damages, including monetary loss, emotional distress, loss of credit, loss of

587    opportunities, attorney fees and costs, and other damages to be determined at trial. As a

588    proximate result of Agents' breach of duty and all other actions as alleged herein, Defendants has

589    suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and

590    mental and physical pain and anguish, all to Petitioner's damage in an amount to be established

591    at trial.

592    **PETITIONER PROPERLY AVERRED A CLAIM FOR BREACH OF THE IMPLIED**

593    **COVENANT OF GOOD FAITH AND FAIR DEALING.**

594    Petitioner properly pled Defendants violated the breach of implied covenant of good faith and

595    fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its

596    performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261*

597    *Cal. Rptr. 735 (1989);* Rest.2d Contracts § 205. A mortgage Agent has fiduciary duties. *Wyatt v.*

PRELIMINARY INJUNCTION              21 of 26

598   *Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v*
599   *Jones, (2004) 33 Cal. 4th 917,* the court stated:

600   In the area of insurance contracts the covenant of good faith and fair dealing has taken on a
601   particular significance, in part because of the special relationship between the insurer and the
602   insured. The insurer, when determining whether to settle a claim, must give at least as much
603   consideration to the welfare of its insured as it gives to its own interests. . . The standard is
604   premised on the insurer's obligation to protect the insured's interests . . . *Id. at 937.*

605   Likewise, there is a special relationship between an Agent and borrower. "A person who
606   provides Agency services to a borrower in a covered loan transaction by soliciting Lenders or
607   otherwise negotiating a consumer loan secured by real property, is the fiduciary of the
608   consumer...this fiduciary duty [is owed] to the consumer regardless of whom else the Agent may
609   be acting as an Agent for . . . The fiduciary duty of the Agent is to deal with the consumer in
610   *good faith.* If the *Agent knew or should have known that the Borrower will or has a likelihood of*
611   *defaulting ... they have a fiduciary duty to the borrower not* to place them in that loan."
612   (California Department of Real Estate, *Section 8: Fiduciary Responsibility,* www.dre.ca.gov).
613   [*Emphasis Added*].

614   All Defendants, willfully breached their implied covenant of good faith and fair dealing with
615   Petitioner when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to
616   provide accurate Right to Cancel Notices; (3) Placed Petitioner into Petitioner's current loan
617   product without regard for other more affordable products; (4) Placed Petitioner into a loan
618   without following proper underwriting standards; (5) Failed to disclose to Petitioner that
619   Petitioner was going to default because of the loan being unaffordable; (6) Failed to perform
620   valid and /or properly documented substitutions and assignments so that Petitioner could
621   ascertain Petitioner rights and duties; and (7) Failed to respond in good faith to Petitioner's
622   request for documentation of the servicing of Petitioner's loan and the existence and content of
623   relevant documents. Additionally, Defendants breached their implied covenant of good faith and
624   fair dealing with Petitioner when Defendants initiated foreclosure proceedings even without the
625   right under an alleged power of sale because the purported assignment was not recorded and by
626   willfully and knowingly financially profiting from their malfeasance. Therefore, due to the
627   special relationship inherent in a real estate transaction between Agent and borrower, *and* all
628   Defendants' participation in the conspiracy, the Motion to Dismiss should be denied.

629  *CAUSE OF ACTION VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. §1601 ET*
630  *SEQ*

631  Petitioner hereby incorporates by reference, re-pleads and re-alleges each and every allegation
632  contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of
633  Action as though the same were set forth herein.

634  Petitioner is informed and believes that Defendant's violation of the provisions of law rendered
635  the credit transaction null and void, invalidates Defendant's claimed interest in the Subject
636  Property, and entitles Petitioner to damages as proven at trial.

637  *INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*

638  The conduct committed by Defendants, driven as it was by profit at the expense of increasingly
639  highly leveraged and vulnerable consumers who placed their faith and trust in the superior
640  knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by
641  civilized society.

642  Defendants either knew that their conduct would cause Petitioner to suffer severe emotional
643  distress, or acted in conscious and/or reckless disregard of the probability that such distress
644  would occur.

645  Petitioner did in fact suffer severe emotional distress as an actual and proximate result of the
646  conduct of Defendants as described hereinabove.

647  As a result of such severe emotional distress, Petitioner suffered economic and non economic
648  harm and detriment, all to be shown according to proof at trial of this matter.

649  Petitioner demands that Defendants provide Petitioner with release of lien on the lien signed by
650  Petitioner and secure to Petitioner quite title;

651  Petitioner demands Defendants disgorge themselves of all enrichment received from Petitioner
652  as payments to Defendants based on the fraudulently secured promissory note in an amount to be
653  calculated by Defendants and verified to Petitioner;

654  Petitioner further demands that Defendants pay to Petitioner an amount equal to treble the
655  amount Defendants intended to defraud Petitioner of which amount Petitioner calculated to be
656  equal to $2,740,662.90

PRELIMINARY INJUNCTION              23 of 26

## REQUEST FOR TEMPORARY INJUNCTION

Plaintiff will suffer imminent and irreparable injury if defendant is not enjoined from foreclosing on the property owned by Plaintiff. Fed. R. Civ. P. 65(b)(1); *see Sampson v. Murray*, 415 U.S. 61, 88-89 & n.59, 94 S. Ct. 937, 951-52 & n.59 (1974).

There is no adequate remedy at law because once the foreclosure sale has taken place Plaintiff will suffer the complete loss of the property as defendant will sell the property to a third party who will have a right to possession without regard to the claims Plaintiff has against defendant. {*See N. Cal. Power Agency v. Grace Geothermal Corp.*, 469 U.S. 1306, 1306, 105 S. Ct. 459, 459 (1984); *Wilson v. Ill. S. Ry. Co.*, 263 U.S. 574, 576-77, 44 S. Ct. 203, 203-04 (1924); *Winston v. Gen. Drivers, Warehousemen & Helpers Local Un. No. 89*, 879 F. Supp. 719, 725 (W.D. Ky. 1995.

There is a substantial likelihood that plaintiff will prevail on the merits. *Schiavo v. Schiavo*, 403 F.3d 1223, 1225 (11th Cir. 2005). Plaintiff will be able to show that:

Defendant has no agency to represent the real party in interest;

- that the alleged real party in interest is unable to prove standing foreclose against and sell the property;

- that the lender committed numerous acts, as listed above, that have the effect of rendering the contract, through which defendant claims authority, void and unenforceable.

The threatened harm to plaintiff outweighs the harm that a preliminary injunction would inflict on defendant. *Schiavo*, 403 F.3d at 1225-26. If defendant is temporarily restrained from selling the instant property, the defendant an plaintiff will befit as if plaintiff is forced to vacate the property, the property will sit empty for the duration of the action. Plaintiff will suffer loss of the use of said property and will loose opportunity to maintain same and defendant will suffer loss by having to maintain an empty property that cannot be insured.

Issuance of a preliminary injunction would not adversely affect the public interest and public policy because there are already a great number of empty houses with the current residential foreclosure mess. Adding more will simply increase the burden on the local as it will create opportunity for vandalism and further other criminal activity.

686         Plaintiff is willing to post a bond in the amount the court deems appropriate.

687         The court should enter this preliminary injunction without notice to defendant because
688 plaintiff will suffer immediate and irreparable injury, loss, or damage if the order is not granted
689 before defendant can be heard as **defendant has scheduled the above referenced sale for the**
690 **week of September 22nd, 2010.**   *First Tech. Safety Sys. v. Depinet*, 11 F.3d 641, 650 (6th Cir.
691 1993).  If said sale is allowed to take place, Plaintiff will be irreparably harm.   {*See O'Connor's*
692 *Federal Rules, "Ex parte," ch. 2-D, §3.1.3, p. 77.*}

693         Plaintiff asks the court to set the request for a preliminary injunction for hearing at the
694 earliest possible time.

**CONCLUSION**

696     13.  Plaintiff has filed suit against defendant wherein Plaintiff has claimed numerous causes
697 of action against defendant.  A number of the allegations made by Plaintiff are incontrovertable
698 by defendant, therefore, Plaintiff will prevail on a number of the above allegations by way if
699 existing records.  For these reasons, plaintiff asks the court to issue a preliminary injunction
700 preventing defendant from foreclosing on the property.

**PRAYER**

702     15.  For these reasons, plaintiff asks that the court do the following:

703         a.   Defendant be prevented from foreclosing on and selling the property until and
704                 unless defendant prevails in the current litigation.

705         b.   Enter judgment for plaintiff.

706         c.   Award costs of court.

707         d.   Grant any other relief it deems appropriate.

708 **Respectfully Submitted,**
709
710
711
712 **Michael Sparlin**                    Sharon  Sparlin
713

714 **VERIFICATION**

715

716

717 We, Michael & Sharon Sparlin , do swear and affirm that all statements made herein are true
718 and accurate, in all respects, to the best of my knowledge.

719 Michael & Sharon Sparlin
720 9151 E Showcase Lane
721 Tucson , AZ 85749
722
723 SWORN TO AND SUBSCRIBED BEFORE ME, _Barbara K Dorr_, by _Michael & Sharon_
724 _Sparlin_, on the _18th_ day of _August_, 2010, which witnesses my hand and seal of office.

725

726

727 **NOTARY PUBLIC IN AND FOR**

728 **THE STATE OF ARIZONA**



OFFICIAL SEAL
**BARBARA K. DORR**
Notary Public - State of Arizona
PIMA COUNTY
My Comm. Expires Sept. 17, 2013