Response to Motion to Dismiss_Chase

Case No: 10-503

1  Name:            **MICHAEL BENSON SPARLIN** and
2                   **SHARON JEANETTE SPARLIN H/W**
3  Address:         9151 E Showcase Lane
4  City, State, Zip: Tucson, AZ 85749
5  Daytime Phone:   520-760-0200
6  *Representing Self, Without a Lawyer*
7

FILED _____ LODGED
RECEIVED _____ COPY

**NOV 29 2010**

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

8              IN THE UNITED STATES DISTRICT COURT
9                      DISTRICT OF ARIZONA
10
11  **MICHAEL BENSON SPARLIN** and          )
12  **SHARON JEANETTE SPARLIN** H/W          )   CASE NO: **CV 10-503-TUC-FRZ**
13  Plaintiffs                              )              **CV 10-507-TUC-FRZ**
14                                          )              **CV 10-508-TUC-FRZ**
15                                          )              **CONSOLIDATED**
16                                          )
17  v                                       )
18                                          )   **PLAINTIFFS VERIFIED**
19                                          )        **RESPONSE**
20  **CHASE HOME FINANCE** and              )   **TO MOTION TO DISMISS**
21  **JPMORGAN CHASE & CO** and             )
22  **BAC HOME LOANS SERVICING, L.P.** and  )   (Hon Frank Zapata)
23  **BANK OF AMERICA N.A**                 )
24  Defendants                              )
25  _____     )

26          COMES NOW Plantiffs, Michael Benson Sparlin and Sharon Jeanette Sparlin, to file their

27  Response to Defendants CHASE HOME FINANCE, LLC ("CHASE") and JPMORGAN CHASE

28  BANK, N.A. ("JPCHASE") Motion to Dismiss and denying all claims presented by the Defendant

29  in this instant case as false.

30                              **PARTIES**

31          (1)     Plaintiffs are Michael Benson Sparlin & Sharon Jeanette Sparlin, 9151 E Showcase

32  Lane, Tucson, AZ 85749, hereinafter referred to as the "Plaintiff."

33          (2)     Currently known defendants are Bank of America, N.A., ("BOA"), BAC Home

34  Loans Servicing, L.P. ("BAC"), JPMorgan Chase & Co. ("JPCHASE") and Chase Home Finance

35  ("CHASE"), BAC Home Loans Servicing, L.P. ("BAC") and Bank of America, N.A. ("BOA")

36                        **MEMORANDUM OF POINTS**

37          (3)     Defendants CHASE and JPCHASE have filed a Motion to Dismiss which Plaintiff

38  finds riddled with false information and inaccurate statements. Plaintiff hereby adamantly denies

39  any and all claims and arguments presented by the Defendants CHASE and JPCHASE in their

Response to Motion to Dismiss_Chase | Case No:  10-503

1  Motion to Dismiss.

2       (4)    Plaintiffs will now address with specificity what has transpired on this alleged debt

3  which brought the Plaintiffs to the point of filing their Original Complaint.

4       (5)    Plaintiffs assert and will be able to prove at trial that immediately upon Plaintiffs

5  signing of the Promissory Note and Deed of Trust, Lender QUICKEN transferred the Promissory

6  Note to Lender CHASE for consideration accepted.

7       (6)    Plaintiffs assert and will be able to prove at trial that upon sale of the Promissory

8  Note from QUICKEN to CHASE,  QUICKEN separated the Promissory Note and Deed of Trust by

9  retaining possession of the Deed of Trust while transferring possession of the Promissory Note.

10  *(see Landmark v. Kessler).*

11       (7)    Plaintiffs assert and will be able to prove at trial that the Promissory Note was

12  subsequently sold to other parties through the Mortgage Backed Securities ("MBS") conduit and

13  failed to properly register said sales with the Pima County Recorder's Office, thereby, obscuring the

14  true holder of the Promissory Note and depriving Pima County of proper and rightful recording

15  fees.

16       (8)    On February 3, 2010 Plaintiff accidentally paid two (2) payments of $1,622.28.

17  (EXHIBIT 1)

18       (9)    Plaintiff was not in default and, in fact, has never been in default since moving into

19  their home in February, 1990.

20       (10)    Plaintiffs contacted CHASE on February 8, 2010, after discovering the double

21  payment, requesting a refund of $1,622.28. (EXHIBIT 2)

22       (11)    Plaintiff was told that the refund would be processed within seven (7) days and a

23  case number was assigned #123418385.  (EXHIBIT 2)

24       (12)    On February 8, 2010, Plaintiff submitted a refund request via fax as instructed.

25  (EXHIBIT 3)

26       (13)    Plaintiff received a phone message from a CHASE representative on February 12,

27  2010 advising they would not be refunding the overpayment.  (EXHIBIT 2)

28       (14)    Plaintiff immediately contacted CHASE back that same day, February 12, 2010,

29  demanding a refund, but the request was again denied.  (EXHIBIT 2)

30       (15)    Plaintiff received a letter dated February 12, 2010 from CHASE advising they would

31  not refund the overpayment.  (EXHIBIT 4)

Response to Motion to Dismiss_Chase | **Case No:  10-503**

1    (16)    Plaintiff attempted one final contact with CHASE on February 15, 2010 demanding

2    a refund of the overpayment or a lawsuit would be forthcoming.  Plaintiffs request again fell on

3    deaf ears and was denied.  (EXHIBIT 2)

4    (17)    Plaintiff ceased mailing of monthly payments to Defendant CHASE but, in good

5    faith, continued making the monthly payments, setting the funds aside each month until the issue

6    was resolved.  (EXHIBIT 22)

7    (18)    Plaintiff sent a *Qualified Written Request* (QWR) to QUICKEN on February 19,

8    2010, tracking #70092820000423264652.  (EXHIBIT 5)

9    (19)    QWR request was delivered to QUICKEN on February 23, 2010. (EXHIBIT 6)

10    (20)    Plaintiff sent a *Qualified Written Request* (QWR) to CHASE on February 19, 2010,

11    tracking #70092820000423264652.  (EXHIBIT 5)

12    (21)    QWR request was delivered to CHASE on February 21, 2010. (EXHIBIT 7)

13    (22)    Plaintiff recorded the *Qualified Written Request* with the Pima County Recorder's

14    Office on February 22, 2010. (Docket 13750, Page 522)  (EXHIBIT 5)

15    (23)    Plaintiff did not receive the required response from either QUICKEN or CHASE

16    within the required 21 days.

17    (24)    Plaintiff sent a *Notice of Default*,(EXHIBIT 8) *Notice of Right to Cancel*,(EXHIBIT

18    9) and *Notice of Revocation of Power of Attorney* (EXHIBIT 10)  to QUICKEN on March 24, 2010,

19    FedEx tracking #870338232295.

20    (25)    *Notice of Default, Notice of Right to Cancel* and *Notice of Revocation of Power of*

21    *Attorney* were delivered to QUICKEN on March 25, 2010.  (EXHIBIT 11)

22    (26)    Plaintiff sent a *Notice of Default, Notice of Right to Cancel,* and *Notice of*

23    *Revocation of Power of Attorney* to CHASE on March 24, 2010, FedEx tracking #870338232300.

24    (27)    *Notice of Default, Notice of Right to Cancel* and *Notice of Revocation of Power of*

25    *Attorney* were delivered to CHASE on March 25, 2010.  (EXHIBIT 12)

26    (28)    Plaintiff sent a *Notice of Removal of Trustee* to QUICKEN on March 24, 2010,

27    naming North American Trust Title as the new Trustee, FedEx tracking #870338232295.

28    (EXHIBIT 13)

29    (29)    Notice of *Removal of Trustee* was delivered to QUICKEN on March 25, 2010.

30    (EXHIBIT 12)

31    (30)    Plaintiff sent a *Notice of Removal of Trustee* to CHASE on March 24, 2010, naming

Response to Motion to Dismiss_Chase | Case No: 10-503

1    North American Trust Title as the new Trustee , FedEx tracking #870338232300.

2       (31)    Notice of *Removal of Trustee* was delivered to CHASE on March 24, 2010.

3    (EXHIBIT 12)

4       (32)    Plaintiff sent a *Notice of Removal of Trustee* to Title Security Agency on March 24,

5    2010, naming North American Trust Title as the new Trustee, FedEx tracking #870338232310.

6       (33)    Notice of Removal of Trustee was delivered to Title Security Agency on March 25,

7    2010. (EXHIBIT 14)

8       (34)    On March 24, 2010, Plaintiff recorded with the Pima County Recorder's Office the

9    *Notice of Default* (Docket 13776, Page 541-EXHIBIT 8), *Notice of Right to Cancel* (Docket 13776,

10   Page 544-EXHIBIT 9), *Notice of Revocation of Power of Attorney* (Docket 13776, Page 548-

11   EXHIBIT 10) and the *Notice of Removal of Trustee* (Docket 13776, Page 551-EXHIBIT 13).

12      (35)    Plaintiff filed a Federal lawsuit on August 18, 2010, Case #10-508, naming CHASE

13   as a Defendant.  This case was later combined with Case #10-503 and an Amended Complaint, as

14   requested by the court, was entered into the record which included adding additional Defendants.

15      (36)    Plaintiff filed a Lis Pendens with the Pima County Recorder's Office on August 23,

16   2010. (Docket 13878, Page 1072-EXHIBIT 17)

17      (37)    CHASE sold the Plaintiffs home at an illegal trustee sale on October 7, 2010.

18      (38)    An illegal Trustees Deed was recorded with the Pima County Recorder's Office on

19   October 12, 2010. (Docket 13912, Page 544-EXHIBIT 18)

20      (39)    Defendant CHASE has illegally sold the Plaintiffs property at a Trustee Sale and

21   fraudulently filed a Trustee's Deed with the County Recorder's Office.

22      (40)    Plaintiffs revoked the Power of Attorney and removed the Trustee from the Deed of

23   Trust in March, 2010 therefore, the Substitution of Trustee filed on July 8, 2010 is invalid. (Docket

24   13846, Page 1021-EXHIBIT 19), the Notice of Trustee's Sale filed July 8, 2010 (Docket 13846,

25   Page 1022-EXHIBIT 20) is invalid, and finally, the Trustee's Deed filed October 12, 2010. (Docket

26   13912, Page 5444-EXHIBIT 18) is invalid.

27      (41)    Plaintiffs exercised their legal right, as defined under Truth-In-Lending and

28   Regulation Z, to rescind the loan in March, 2010 by sending the following documents:

29       • Qualified Written Request

30       • Notice of Default

31       • Revocation of Power of Attorney of Attorney

Response to Motion to Dismiss_Chase | Case No:  10-503

1   ● Notice of Right to Cancel

2   ● Notice of Removal of Trustee

3   ● Demand for Clarifications

4   ● Notice of Signature Revocations

5   ● Demand for Production of Real Party in Interest

6   ● Demand to Inspect Original Contract

7   ● Demand for Validation of the Alleged Debt (per FDCPA)

8   ● Demand for Audits of the Entire Account

9   (42)   The Congress of the United States intended to make rescission remedy available in

10   ALL instances where prohibited conduct occurs in the course of the credit transaction.

11   (43)   The above mentioned statements of facts are not an exhaustive list, as other

12   violations may be uncovered through discovery.

13   (44)   Under the Federal Rules of Civil Procedures, it may be sufficient to plead that the

14   Truth-In-Lending Act ("TILA") has been violated.  **Fed.R.Civ.P. 8(a)**).

15   (45)   Specific violations do not necessarily have to be alleged with particularity. *Brown v.*

16   *Montgagestar, 194 F. Supp. 2d473 (S.D.W.Va. 2002)*; *Herrara v. North & Kimball Group, Inc.,*

17   *2002 WL 253019 (N.D. Ill. Feb.20, 2002)*; *Staley v. Americorp Credit Corp, 164 F.Supp. 2d 578 (D.*

18   *Md. 2001)*; *Hill v. GFC Loan Co., 2000 U.S. Dist. Lexis 4345(N.D. Ill. Feb. 15, 2000).*

19   (46)   The principle of equitable tolling <u>DOES</u> apply to TILA rescission since, despite

20   Plaintiffs due diligence,  Plaintiff could NOT have reasonably discovered even the possibility of the

21   concealed facts of TILA violations until Plaintiff read the Truth-In-Lending book by the National

22   Consumer Law Center and also the "Truth-In-Lending Disclosure Requirements, Violations, and

23   Remedies" paper written by Leslie B. Ng on June 13, 2007.  Ms Ng graduated magna cum lauda

24   from the University of Arizona and is currently an associate attorney with the firm of Farah and

25   Farah, P.A. in Jacksonville, Florida.  (EXHIBIT 15)

26   (47)   **The equitable tolling principles are to be read into every federal statue of**

27   **limitations unless Congress expressly provides to the contrary in clear and ambiguous**

28   **language**.  (*Rotella v. Wood, 528 U.S. 549, 560-61, 120 S.Ct. 1075, 145 L.Ed. 2d 1047 (2000)*)

29   (48)   Since TILA does not evidence a contrary Congressional intent, its statue of

30   limitations <u>MUST</u> be read to be subject to equitable tolling,  particularly since the act is to be

31   construed liberally in favor of the consumer.

Response to Motion to Dismiss_Chase | **Case No:  10-503**

1   (49)   The statute and regulation specify that the security interest, promissory note or lien

2   arising by operation of law on the property becomes automatically void. (**15 U.S.C. § 1635(b)**;

3   **Reg.Z §§ 226.15(d)(1), 226.23(d)(1).**

4   (50)   As noted by the Official Staff Commentary, the creditor's interest in the property is

5   "automatically negated regardless of its status and whether or not it was recorded or perfected."

6   (**Official Staff Commentary §§ 226.15(d)(1)-1,** (EXHIBIT 16) and **226.23(d)(1)-2**) (EXHIBIT

7   21). www.fdic.gov/regulations/laws/rules/6500-2280.html

8   (51)   Also, the security interest is void and of no legal effect irrespective of whether the

9   creditor makes any affirmative response to the notice.   Further, strict construction of Regulation Z

10   would dictate that the voiding be considered absolute and not subject to judicial modification.   This

11   required any and all parties of interest to submit canceling documents creating the security interest

12   and filing release or termination statements in the public record. (**Official Staff Commentary §§**

13   **226.15(d)(2)-3, 226.23(d)(2)-3**)

14   (52)   The statute and Regulation Z make it clear that if Plaintiff has the extended right and

15   chooses to exercise it, which is evident in this case, the security interest and obligation to pay

16   charges are automatically voided. See *Cf. Semar v. Platte Valley Fed.Sav & Loan Ass'n. 791 F.2d*

17   *699, 704-05 (9th Cir.1986* which states "courts do not have equitable discretion to alter substantive

18   provisions of TILA, so cases on equitable modification are irrelevant".

19   (53)   The statute, section **1635(b)** states: "When an obligor exercises his right to cancel. . .

20   . . . , any security interest given by the obligor . . . becomes void upon such rescission".

21   (54)   Plaintiffs assert that effective March 24, 2010 – the date Plaintiff mailed the Notice

22   of Right to Cancel – any alleged debt to Defendants CHASE and/or JPCHASE and/or QUICKEN

23   became null and void, in accordance with **Reg.Z §§ 226.15(d)(1), 226.23(d)(1),** and Defendants

24   CHASE and JPCHASE Motion to Dismiss should be DENIED.

25   (55)   Plaintiff has spent countless hours of research relative to this case and has attached

26   EXHIBIT 23 in support of Plaintiffs case law study.

27   **PREFATORY STATEMENT**

28   (56)   Plaintiff hereby informs this Court of newly discovered material facts relevant to this

29   matter.

30   **A. Deceptive Business Act, Invalid Substitution Of Trustee**

31   (57)   In a contract, both sides have an obligation, a duty to perform.

1    (58)    The Plaintiff has a right to EXPECT and the Defendants have a duty to FIT AND

2    FAIR DEALINGS.

3    (59)    The Plaintiff has a right to EXPECT and the Defendants have a duty to REFRAIN

4    FROM COMMITTING FRAUD BY OMISSION.

5    (60)    Class action lawsuits have already been initiated in California, Tennessee, Georgia,

6    New York, Florida, Kentucky and other states against Mortgage Electronic Registration Systems

7    Inc.'s ("MERS") and MERSCORP, Inc.("MERSCORP") unlawful appointment of Successor of

8    Trustee in violation of the Deed of Trust. This violation invalidates any appointment by MERS and

9    therefore causes the foreclosure process to be VOID, not just voidable, but VOID, *ab initio*, if a

10   Successor Trustee was appointed by MERS, which in this instant case did occur.  Courts across this

11   country have upheld that MERS lent nothing, collected nothing and never had anything to do with the

12   cash involved in the transaction.  Since MERS owns nothing, it can assign nothing, and the chain of

13   title has been irretrievably broken.

14   (61)    MERS is a nebulous, database-driven entity created by the mortgage industry which

15   has no employees.  It's designed to let lenders swap mortgages electronically without being slowed

16   down by inconvenient courtroom rules. MERS is "Digital Life" for mortgages, an electronic shell

17   game that makes it hard to track the real party behind a loan.

18   (62)    The company's own publicly available documents paint the picture of a legal shape

19   shifter that appears before the court as the lender and title holder, then morphs itself into a mere

20   service organization when it's time to take responsibility. Designated officers of the servicers" are

21   "elected" as officers of MERS so that they can act on behalf of their own company while pretending

22   to act for this artificial one.

23   (63)    CHASE was only the *servicer* for this loan, but it wanted to score a foreclosure so it

24   pretended that it actually held the title on the loan. That's the kind of deception that becomes vastly

25   easier to carry out using the legal and electronic instruments provided by MERS. Most likely, that

26   was why MERS was created by the financial institutions.

27   (64)    CHASE "securitized" our loan, turned it into a Mortgage Backed Securities ("MBS")

28   and then sold it off to investors. MBS are typically pooled through a type of "special purpose vehicle"

29   called a Real Estate Mortgage Investment Conduit ("REMIC"), which has strict requirements defined

30   under the U.S. Internal Revenue Code (the Tax Reform Act of 1986).

1        (65)    Our mortgage was pooled into a REMIC Trust as a tax avoidance measure.  As outlined

2    in the Pooling & Servicing Agreement of the MBS, in order to qualify, *the properties must be properly*

3    *conveyed to the trustee of the REMIC in the year the MBS is set up, with all the paperwork necessary to*

4    *show a complete chain of title.*  That was not done; and there is no legitimate way to create those

5    conveyances now, because the time limit allowed under the Tax Code has passed.

6        (66)    The question is, why weren't they done properly in the first place? Was it just haste and

7    sloppiness as alleged? Or was there some reason that these mortgages could NOT be assigned when the

8    MBS were formed? It would not have been difficult to do it right from the beginning. Perhaps the

9    documents were "lost" to avoid an audit, which would have revealed to the true investors that they had

10    been sold a bill of goods -- a package of toxic subprime loans very prone to default.

11        (67)    The real parties in interest are a group of investors somewhere.  These investors have

12    to come forward and prove not only that they are the parties owed the money, but the actual sums

13    they are owed. Perhaps the investors have already been paid;  for example, by insurers on credit

14    default swaps held by the investment pool. The investors are entitled to recover in equity only so

15    much as they are actually out of pocket, not the full amount of the original promissory notes, since

16    they were not parties to those notes and there is no way to re-establish the chain of title.

17    *Indymac Bank v. Bethley, 880 N.Y.S.2d 873 (2009).* The Court is concerned that there may be fraud

18    on the part of plaintiff.  Plaintiff  Indymac must have "standing" to bring this action.

19    *Deutsche Bank v. Peabody, 866 N.Y.S.2d 91 (2008).* " . . . . intentionally created fraud in the

20    factum" and withheld from plaintiff… "vital information concerning said debt and all of the matrix

21    involved in making the loan". *Wells Fargo v. Reyes, 867 N.Y.S.2d 21 (2008).* Case dismissed with

22    prejudice, fraud on the Court and Sanctions because Wells Fargo never owned the Mortgage.

23    *Wells Fargo, Litton Loan v. Farmer, 867 N.Y.S.2d 21 (2008).* Wells Fargo does not own the

24    mortgage loan.

25        (68)    Fed R. Civ. P. 17(a)(1) requires that "an action must be prosecuted in the name of

26    the real party in interest." *In re Jacobson, 402 B.R. 359, 365-66* (Bankr. W.D.Wash. 2009); *In re*

27    *Hwang, 396 B.R. 757, 766-67* (Bankr. C.D. Cal. 2008).

28        (69)    Defendants CHASE and JPCHASE have no argument against this concept as

29    Defendants are the ones that wrote the Deed of Trust, yet Defendants defense is inclusive of

30    claiming MERS can appoint a Successor Trustee

1    (70)    Defendants claim in this case contradicts Defendants requirement in the Deed Of
2    Trust, therefore Defendants' claim is now moot

3    (71)    Since it is a material fact that the foreclosure was initiated by an incorrect party that
4    did not have the lawful right to initiate the foreclosure, all of Defendants claims, statements,
5    attestations, and the like in this matter are also void *ab initio*

6    (72)    The Deed of Trust language under "Substitute Trustee" clearly states that the Lender
7    may  from time to time, remove Trustee and appoint a successor Trustee to any Trustee appoint
8    hereunder. The Lender as defined on page 1 of the Deed of Trust is Quicken Loans, Inc. This
9    paragraph does not state that successors, assigns, or nominees may appoint a Successor Trustee.
10   Therefore, The Substitution Of Trustee is invalid as it was executed by an individual asserting the
11   position of Assistant Secretary for MERS, Inc. and not the Lender.

12   (73)    Defendant states that Quicken has assigned interest over to CHASE by way of an
13   Assignment and attached an EXHIBIT in support of their claim.  Upon review of this EXHIBIT,
14   Plaintiffs find several issues that show the invalidity of this Assignment:

15        a.   Assignment was recorded 7/21/2010 which is a full 4 months AFTER the alleged
16             default of said Promissory Note.  Why would CHASE be filing on 7/21/2010 if
17             they purchased the loan from Quicken in January, 2007?

18        b.   The Assignment is signed by one Jennifer Hamlin as Assistant Secretary for
19             MERS, Inc. on July 5, 2010.  Plaintiff has confirmed that Jennifer Hamlin does
20             not work for MERS, Inc. but is employed by Tiffany & Bosco.  Ms Hamlin is
21             simply signing on MERS behalf without proper documentation and transcript
22             depositions confirm these Assignments to be void.

23        c.   Plaintiff asserts and affirms that MERS has no authority to either appoint an
24             Assistant Secretary or allow same to Assign a Deed of Trust.   What follows are
25             excerpts taken from a 170 page deposition transcript this Plaintiff has obtained
26             deposing Mr. William Hultman, Secretary of MERS, Inc. affirming Plaintiffs
27             claims.  This deposition was taken on April 7, 2010.  Due to the sheer volume,
28             Plaintiff has chosen to not attach the deposition in it's entirety to this response
29             but instead provide the website address where the entire transcript can be read.
30             http://www.scribd.com/doc/36521121/Full-Deposition-of-William-Hultman-
31             Secretary-and-Treasurer-of-MERSCORP

Response to Motion to Dismiss_Chase | Case No: 10-503

1
2
3
**Page 61, line 8**
Q.  Your testimony, Mr. Hultman, is back in April of 1998 the Board of a
predecessor company authorized you to appoint non-members of MERS as assistant
secretaries and vice-presidents of a successor corporation?
A. No
Q.  What did the Board do in April of 1998 in terms of authorizing you to appoint
anyone to do anything?
A. What they authorized me to do was they delegated me the authority to elect
persons requested by members to be officers of Mortgage Electronic Registration
Systems, Inc.
Q. What kind of officers?
A. Assistant secretary and vice-president.
Q. And your testimony is that is what the Board did in April of 1998?
A. Yes
Q. And that resolution that was passed back in April of 1998 was by a company that
as I understand it went out of existence in June of 1998, is that correct?
A. Yes
Q. How does a resolution of a company that went out of existence in June of 1998
become effective October 23, 2007?
A. As I explained to you before, the corporation – the first MERS corporation went
out of existence and the second MERS corporation assumed its duties and
obligations and then when the third MERS corporation was formed, that corporation
assumed some of the duties and obligations of the original MERS vis-à-vis the
second MERS.  At that point, what I think I said was that I didn't know where the
documentation was that ratified the original resolution.
**Page 64, line 17**
Q. Was the resolution of April 9, 1998 granting the secretary the power to appoint
certifying officers adopted by the new MERS corporation on or after January 1,
1999?
A. I don't know
**Page 68, line 19**
Q. Do the assistant secretaries of the corporation report to the secretary of the
corporation?
A. Yes
Q. Do the assistant secretaries – first off, are you a salaried employee of MERS?
A. No
Q. Are you a salaried employee of MERS Corp, Inc.?
A. Yes
**Page 69, line 13**
Q. I thought, sir, there's a company that was formed January 1, 1999, Mortgage
Electronic Registration Systems, Inc.  Does it have paid employees?
A. No, it does not.
Q. Does it have employees?

1   A. No.
2   **Page 70, line 7**
3   Q. In the last five years has MERS had any employees?
4   A. No
5   Q. To whom do the officers of MERS report?
6   A. The Board of Directors.
7   **Page 71, line 13**
8   Q. How many assistant secretaries have you appointed pursuant to the April 9, 1998
9   resolution: how many assistant secretaries of MERS have you appointed?
10  A. I don't know that number.
11  Q. Approximately?
12  A I wouldn't even begin to be able to tell you right now.
13  Q. Is it in the thousands?
14  A. Yes
15  **Page 98, line 5**
16  Q. My question is after you appointed Mr Hallinan an officer of MERS pursuant to
17  what you claim you had authority to do based on an April 9, 1998 resolution by
18  MERS one, did the MERS three Board every do anything to ratify your appointment,
19  Mr. Hultman.
20  A. No
21  Q Prior to your appointment of Mr. Hallinan as a MERS officer did the MERS three
22  Board every do anything to ratify your authority to appoint corporate assistant
23  secretaries and vice-presidents?
24  A. And that's the part that I've said to you, I need to go back and review the
25  minutes to produce the documentation for that.
26  Q. And just to clarify, you're uncertain what the answer is presently?
27  A. I have no recollection either that it's there or it's not there.  I need to go
28  back and look for it.
29  **Page 121, line 19**
30  Q.  On the attachment . . .  the Corporate Resolution, the form Corporate
31  Resolution, has five numbered paragraphs.  Do you see those?
32  A. Yes
33  Q. Do any of those numbered paragraphs authorize the certifying officers to
34  assign a promissory note?
35  A. No
36  Q. Has MERS to your knowledge ever authorized a certifying officer to
37  assign a promissory note?
38  A. I don't recall.
39  **Page 122, line 25**
40  Q. I understand . . . . a promissory note was executed on July 29, 2005 in the
41  amount of $224,000 and a mortgage giving a security interest to MERS as
42  nominee for an identified lender was also executed.  The mortgage was
43  recorded with the county clerks office.  What is the value of that mortgage to
44  MERS when it's recorded?
45  A. I don't understand what you mean by value.
46  Q. Well, does it have some value to MERS that MERS can sell it for?

Response to Motion to Dismiss_Chase | Case No: 10-503

1    A. If you mean can we sell the mortgage and receive consideration or
2    monetary value, no.
3    Q. Does MERS report the mortgage as an asset?
4    A. No.
5    Q. Does MERS pay any taxes on the mortgage?
6    A. Well, there are recording taxes paid in certain jurisdictions by the
7    borrowers.
8    Q. Other than those recording taxes, does MERS pay any taxes on it as if it
9    were a property asset?
10    A. No
11    Q. When a certifying officer assigns a mortgage, does MERS receive any
12    money?
13    A. No.
14    **Page 132, line 16**
15    Q. And have the bylaws ever been amended, either set of those bylaws, been
16    amended to provide for appointment of assistant secretaries by you?
17    A. As I said, neither set was amended to my knowledge.
18    **Page 138, Line 9**
19    Q. Does MERS have an ownership interest in the promissory note?
20    A If you mean ownership interest in the sense that we are entitled to any of
21    the proceeds of the promissory note, the answer is no.
22    **Page 148, line 17**
23    Q Do you see the words together with the bond, note or other obligation?
24    A.Yes
25    Q.Does that indicate to you that not only is there an assignment of the
26    mortgage interest, but this document purports to assign an interest in the
27    note?
28    A. It says what it says.
29    Q. And reading it, does it indicate to you that there is an assignment of the
30    note?
31    A. It says what it says.
32    **Page 150, line 10**
33    Q. What was MERS interest in the Ukpe promissory note as of March 14,
34    2008?
35    A. As I answered twice before, I believe, we hold the security interest for the
36    benefit of the note holder as an agent and to the extent that that's an interest,
37    it's an interest.
38    Q. And that's your answer, that's MERS interest in the note?
39    A. In this particular case, yes.
40    Q. And what was the value of that interest in the Ukpes note to MERS?
41    A. If you mean is there a monetary value
42    Q. Yes
43    A –there isn't any.
44

Response to Motion to Dismiss_Chase | Case No: 10-503

(74)    Creation of evidence to support a motion for relief from stay, AFTER filing has been found to violate Fed. R. Bankr. P. 9011(b)(3). See *In re Maisel, 378 B.R. 19,22* (Bankr.D.Mass 2007).

**B. Defendants are withholding relevant evidence –**

(75)    Defendants state in the Deed Of Trust, on page 2 paragraph H:  "**a debt evidenced by a note**." Therefore, the "Note" is relevant and material evidence in this matter. Since Defendants claim the debt is evidenced by a note, and this Court is not in possession of said evidence, this Court may only conclude that the debt does not exist since the evidence does not exist in this Court.

(76)    There is nothing in American jurisprudence that would allow this Court to conclude facts not in evidence are still facts and use evidence that does not exist to this Court as evidence in Defendants favor.

(77)    Until such a time as this Court has the evidence that Defendants claim establishes the debt does exist, the debt does not exist to this Court.

(78)    Absent a debt, the loan does not exist, absent the loan, the Deed Of Trust does not exist, absent a valid Deed Of Trust; therefore the foreclosure documents are nothing more than prima facie evidence of Defendants felonious act of attempting to steal Plaintiff's real property by filing false and/or forged documents into a public office in Arizona; a felony under **A.R.S. § 39-161.**

## SUFFICIENCY OF PLEADING

(79)    A complaint should not be dismissed "unless it appears beyond a doubt that the Plaintiff can prove no set of facts in support of her claim which would entitle her to relief". (*Housley v. U.S. (9th Cir. Nev. 1994 35 F.3d 400, 401*)

(80)    "All allegations of material fact in the complaint are taken as true and construed in the light most favorable to Plaintiff." (*Argabright v.United States, 35 F.3d 1476, 1479 (9th Cir. 1996)*.

(81)    Plaintiff has sufficiently pled that relief can be granted on each and every one of the complaint's causes of action.

(82)    The Complaint includes short, plain and precise statements of the basis for relief in accordance with Fed. Rule Civ. Proc. 8(a).

(83)    The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal theories, and seeks remedies to which Plaintiff s are entitled.  (*Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986)*).

Response to Motion to Dismiss_Chase | Case No: 10-503

1    (84)    "The legal conclusions in the complaint can and should be drawn from the facts alleged,

2    and, in turn, the court should accept them as such." (*Clegg v. Cult Awareness Network, 18 F.3d 752* (9th Cir,

3    1994)).

4    (85)    Plaintiff's complaint contains claims and has a probable validity of proving a "set of facts" in

5    support of their claim entitling them to relief. (*Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401*).

6    Therefore, relief as requested herein should be granted.

7    ## DEMAND FOR TRIAL BY JURY

8    (86)    Plaintiffs assert their rights under the Seventh Amendment to the U.S.

9    Constitution and demand, in accordance with Federal Rule of Civil Procedure 38, a trial by

10   jury on all issues.

11

12   **WHEREFORE**, Plaintiffs move this court to DENY Defendants CHASE and JPCHASE

13   Motion to Dismiss and order in favor of the Plaintiff:

14   •For rescission of the loan contract and restitution by Defendants to Plaintiff according to

15   proof at trial;

16   •For disgorgement of all amounts wrongfully acquired by Defendants according to proof at

17   trial;

18   •For actual monetary damages in the amount of $358,119.97

19   •For pain and suffering due to extreme mental anguish in an amount to be determined at

20   trial;

21   •For pre-judgment and post-judgment interest according to proof at trial;

22   •For punitive damages according to proof at trial in an amount equal to $1,074,359.91

23   •For such other relief as the Court deems just and proper.

24

25

26

27

28

29

30

1
2                                      **<u>VERIFICATION</u>**
3
4   We, Michael Benson Sparlin & Sharon Jeanette Sparlin, do swear and affirm that all statements
5   made herein are true and accurate, in all respects, to the best of our knowledge.
6
7   _____              _____
8   **MICHAEL BENSON SPARLIN**                    **SHARON JEANETTE SPARLIN**
9   9151 E Showcase Lane                          9151 E Showcase Lane
10  Tucson, Az 85749                              Tucson, AZ  85749
11
12  The persons above, who proved to me on the basis of satisfactory evidence to be the persons whose
13  names are subscribed to this document and acknowledged to me that they executed the same in their
14  authorized capacity and that by their signatures on this instrument who is the person who executed
15  this instrument. I certify under PENALTY OF PERJURY under the laws of this State that the
16  foregoing paragraph is true and correct.
17
18  Witness my hand and official seal.
19
20                                                    ┌──────────────────────────────┐
21                                                    │        WANDA E. HAMMONDS      │
22  _____                  │     NOTARY PUBLIC - ARIZONA   │
23  **NOTARY PUBLIC IN AND FOR**       _____│          PIMA COUNTY         │
24  **THE STATE OF ARIZIONA**          **Notary Seal**│      My Commission Expires    │
25                                                    │          July 24, 2013        │
26                                                    └──────────────────────────────┘
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43

Response to Motion to Dismiss_Chase | Case No: 10-503

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and exact copy of the above has been furnished by U.S. Mail on this _____26th_____ day of November, 2010 to the following:

**MAYNARD CRONIN ERICKSON**
**CURRAN & REITER, P.L.C.**
Douglas C Erickson, #012130
Jennifer A Reiter, #017502
3200 North Central Avenue, Ste 1800
Phoenix, Arizona 85012
    *Attorneys for Defendants Chase Home Finance, LLC and JPMorgan Chase & Co*

**BRYAN CAVE LLP**
Robert W Shely #014261
Coree E Neumeyer #025787
Michael B Dvoren #027386
Two North Central Avenue, Ste 2200
Phoenix, Arizona  85004-4406
    *Attorneys for Defendants BAC Home Loans Servicing, LP and Bank of America, NA*

**SHARON JEANETTE SPARLIN**