Response to Motion to Dismiss_BAC | **Case No: 10-503**

| | |
|---|---|
| 1 | Name: **MICHAEL BENSON SPARLIN** and |
| 2 | **SHARON JEANETTE SPARLIN** H/W |
| 3 | Address: 9151 E Showcase Lane |
| 4 | City, State, Zip: Tucson, AZ 85749 |
| 5 | Daytime Phone: 520-760-0200 |
| 6 | *Representing Self, Without a Lawyer* |

FILED
LODGED
RECEIVED
COPY

DEC 2 9 2010

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

**MICHAEL BENSON SPARLIN** and )
**SHARON JEANETTE SPARLIN** H/W ) CASE NO: **CV 10-503-TUC-FRZ**
Plaintiffs ) **CV 10-507-TUC-FRZ**
    ) **CV 10-508-TUC-FRZ**
    ) **CONSOLIDATED**
    )
v )
    ) **PLAINTIFFS MEMORANDUM**
    ) **IN SUPPORT OF**
    ) **RESPONSE TO DEFENDANTS**
**CHASE HOME FINANCE** and ) **MOTION TO DISMISS**
**JPMORGAN CHASE & CO** and )
**BAC HOME LOANS SERVICING, L.P.** and ) (Hon Frank Zapata)
**BANK OF AMERICA N.A** )
Defendants )
_____ )

## MEMORANDUM

COMES NOW Plaintiffs, Michael Benson Sparlin and Sharon Jeanette Sparlin, to file their

Memorandum in Support of Response to Defendants BAC Home Loans Servicing, L.P. ("BAC")

and Bank of America, N.A. ("BOA") Motion to Dismiss.

## RESPONSES TO DEFENDANTS ARGUMENTS

**A. The Court Did Not Grant the Sparlins Permission To Add BofA as A Defendant and BofA Has Not Been Properly Served.**

(1)    Plaintiffs were granted leave to file their Amended Complaint by ORDER recorded

November 2, 2010.

(2)    Defendant BAC, formerly doing business as Countrywide Home Loans ("CHL"), is

registered in the state of Texas as a limited partnership with its principal place of business in

Calabasas, CA. (EXHIBIT 1)

(3)   BAC changed the name Countrywide Home Loans Servicing, LP to BAC on April 21, 2009.  (EXHIBIT 2)

(4)   Defendant argues that BOA should not be added as a Defendant for reasons which include improper service.  Pursuant to **FRCP 1515(C)(1)(C)(ii),** when Plaintiff filed the Original Petition in this instant case, proper service was executed on BAC which is a <u>subsidiary of BOA.</u>

(5)   Plaintiffs research of the word "**subsidiary**" provided the following definition:

> "in business matters, a subsidiary is an entity that is <u>*controlled by a separate higher entity*</u>. The controlled entity is called a company, corporation, or limited liability company; and in some cases can be a government or state-owned enterprise, and the controlling entity is called its parent (or the parent company)."

(6)   Plaintiff also verified through Defendants own website www.homeloanbusiness.bankofamerica.com  (EXHIBIT 3) evidence to convince Plaintiff to include BOA as a Defendant.  According to the Bank of America website it specifically states:

> "the words BAC Home Loans Servicing, LP, "we", "us", and "our" mean BAC Home Loans Servicing, LP, a subsidiary of Bank of America, N.A., and any company affiliated with BAC Home Loans Servicing, LP."

(7)   When BOA assigned counsel to this case, Defendant knew, or should have known, that BOA should have been listed as a Defendant in Plaintiffs Original Petition.

(8)   Based on the definition of the word subsidiary, the State of Texas filings and the Defendants own website, Plaintiff added the "parent company" of BOA to the Amended Complaint and did not believe that another Service would be required.  Plaintiffs Amended Complaint should not be dismissed based on this argument as **BAC is BOA** and **BOA is BAC.**  If instructed by this court, Plaintiffs will properly serve BOA.

**B. The Amended Complaint Fails to Comply With The Court's October 04, 2010 Order and Fails to Satisfy Rule 8's Pleading Requirements.**

(9)   Defendants BAC and BOA cite **FRCP Rule 12(b)** and **Rule 8** as their grounds for dismissal.  Plaintiffs filed their Amended Complaint adhering to **Rule 8** by stating short, clear and concise statements.   Further, Plaintiffs complied with **Rule 12(b)** by stating a claim for which recovery could be had.  Therefore, Defendant BAC and BOA Motion to Dismiss is frivolous.

**C. The Sparlins Fail to State Any Fraud Claim As Against BAC or BofA (Count One)**

(10)    To establish fraud on the court, the Plaintiff must show the following elements:

(a) that Defendant had knowledge of material facts which Plaintiff did not have and which Plaintiff could not have discovered by the exercise of reasonable diligence.

(b) that Defendant was under an obligation to communicate the material facts to the Plaintiff

(c) that Defendant intentionally failed to communicate to Plaintiff the material facts

(d) that Plaintiff justifiably relied on Defendant to communicate the material facts to Plaintiff

(e) that Plaintiff sustained damages as a result of Defendants failure to communicate the material facts to the Plaintiff. *Wilson v Meeks*, 52 F3D 1547 (10th Cir. 04/20/1995).

(11)    Plaintiff has provided ample evidence to support each of these elements and asserts again that Defendants have committed fraud on the court.

(12)    Defendants are not the creditor nor agent of the creditor and are improperly attempting to foreclose on Plaintiffs properties while refusing to disclose the identity of the "true" creditor and refusing to provide a full and meaningful disclosure.

**D. The Sparlins Fail to State Any Claim for Violation of A.R.S. §§ 33-401-423 or A.R.S. §§ 33-801-821 (Count Two).**

(13)    Defendants argue that Plaintiff has provided vague allegations relative to violations of **A.R.S. §§ 33-401-423** and **A.R.S. §§ 33-401-423** and have not identified which statutes have been violated.   Plaintiffs hereby assert that violations have been committed by Defendant relative to property A, which is currently scheduled for Trustee Sale on *January 21, 2011* and relative to property C, which is currently scheduled for Trustee Sale on *February 2, 2011* as follows:

**A.R.S. § 33-420 (A)**
**A.R.S. § 33-411 (A)**
**A.R.S. § 33-411.01**
**A.R.S. § 33-503 (1), (2), (4)**
**A.R.S. § 33-505 (1),**
**A.R.S. § 33-505 (3)(b),**
**A.R.S. § 33-505 (3)(d)**
**A.R.S. § 33-803.01(A)(1)(a)**
**A.R.S. § 33-804 (C)**
**A.R.S. § 33-808 (A),  (A)(1), (A)(2), (A)(3), (A)(4), (C), (C)(1), (C)(2), (C)(3), (C)(4), (C)(5), (C)(6), (C)(7)**

1   A.R.S. § 33-810 (B)
2   A.R.S. § 33-813 (D)
3
4   **E.  The Sparlins Fail to State A Claim for Breach of Contract (Count Three).**

5   (14)   Defendants have intentionally mislead Plaintiffs and engaged in material omissions
6   by failing to disclose to Plaintiffs the fact that the nature of the mortgage loan applications have
7   been materially changed without Plaintiffs knowledge or consent and that the Plaintiffs were being
8   placed into a mortgage program without being qualified for such a program.

9   (15)   In further support of the fraud allegations, Plaintiff has done extensive research that
10  indicates that the Defendants never "loaned" any of their money at all, contrary to Defendants statement
11  on their Motion to Dismiss Amended Complaint, page 10, line 22-23.  In fact Plaintiffs assert that they
12  credited/deposited the promissory note signed by Plaintiff, used that deposit to pay the seller, and
13  continued to use Plaintiff's good name and credit for their own profit and criminal enterprise.

14  (16)   On Plaintiffs information and belief and given that the notes in this action involved
15  multiple assignments as part of an aggregation and the creation of REMIC tranches, itself a part of a
16  predetermined and identifiable Colateralized Mortgage Obligation ("CMO"), all Defendants shared
17  in the illegal proceeds of the transaction; conspired with each other to defraud the Plaintiffs out of
18  the proceeds of the loans; acted in concert to wrongfully deprive the Plaintiffs of their property;
19  acted in concert and conspiracy to essentially try and 'steal' the Plaintiffs property and/or convert
20  the Plaintiffs property without providing Plaintiffs reasonably equivalent value in exchange; and
21  have conducted an illegal enterprise within the meaning of the RICO statute.

22  (17)   Plaintiff alleged that the original lender, Universal American Mortgage Company,
23  LLC ("UAMC"), acted as a mortgage broker and immediately upon closing, sold the security
24  instrument (the note) to "CHL" for consideration accepted.

25  (18)   Plaintiff alleged, and will be prepared to prove at trial, that CHL immediately sold
26  Plaintiffs Notes through a Real Estate Investment Conduit ("REMIC").   In fact, a holder in due
27  course may not exist, having been deconstructed and eliminated during the securitization process.

28  (19)   Plaintiffs allege and believe that their Notes were placed into a Special Purpose
29  Vehicle ("SPV") CWALT, Inc. and ultimately placed into the Mortgage Backed Security titled
30  "Alternative Loan Trust 2007-HY4 Mortgage pass-thru Certificates, Series 2007-HY4".
31  filed with the Securities and Exchange Commission on February 1, 2007, SEC #333-131630-82,
32  Accession #1144204-7-4680.

Response to Motion to Dismiss_BAC | Case No: **10-503**

● ***Issuing Entity***
Alternative Loan Trust 2007-HY2, a common law trust formed under the laws of the State of New York.

● ***Depositor***
 CWALT, Inc., a Delaware corporation, is a limited purpose finance subsidiary of Countrywide Financial Corporation. Its address is 4500 Park Granada, , California 91302, and its telephone number is (818) 225-3000.

● ***Sponsor and Sellers***
 Countrywide Home Loans, Inc. will be the sponsor of the transaction and a seller of a portion of the mortgage loans. The remainder of the mortgage loans will be sold directly to the depositor by one or more special purpose entities that were established by Countrywide Financial Corporation or one of its subsidiaries, which acquired the mortgage loans they are selling directly from Countrywide Home Loans, Inc.

● ***Master Servicer***
Countrywide Home Loans Servicing LP

● ***Trustee***
The Bank of New York

● ***Cut-off Date***
 For any mortgage loan conveyed to the issuing entity on the closing date, the later of January 1, 2007 and the origination date for that mortgage loan (referred to as the "***initial cut-off date***"). For any mortgage loan conveyed to the issuing entity after the closing date, the later of the origination date of that mortgage loan and the first day of the month of the conveyance to the issuing entity.

● ***Closing Date***
On or about January 31, 2007

(20)     The Pooling and Servicing Agreement for the "Alternative Loan Trust 2007-HY4 Mortgage pass-thru Certificates, Series 2007-HY4" filed with the Securities and Exchange Commission on February 1, 2007, SEC #333-131630-82, Accession #1144204-7-4680, <u>requires by New York trust law, that the note be endorsed to the pool and physically delivered by the closing date of January 31, 2007</u> .   When the notes are transferred out of a trust, (which is a non-MERS member), pursuant to MERS own rules, it must be recorded.   <u>*Gomez v. Countrywide Bank*</u>, FSB, 2:09-cv-01489-RCJ-LRL (10/26/2009).  Plaintiff is unable to locate any such transfer which is in

1   direct violation of the Pooling and Servicing Agreement. Highlighted excerpts from the Pooling

2   and Servicing Agreement are attached as EXHIBIT 4.

3       (21)    Not conveying the notes on Plaintiffs properties is not an isolated case but a

4   continual pattern and practice of the Defendant.   There are numerous website articles regarding a

5   CHL testimony in a New Jersey bankruptcy case where Defendants admits to "not conveying notes

6   to mortgage securitization trusts", thus in direct violation of numerous SEC, New York State trust,

7   Federal, State and local laws and regulations.  EXHIBIT 5 taken from www.roubini.com

8       (22)    Contract law is based on the principle expressed in the Latin phrase *pacta sunt*

9   *servanda,* which is usually translated "agreements to be kept" but more literally means "pacts must

10  be kept".  The Defendants did not keep their agreement/pact and therefore a breach of contract has

11  occurred.

12

13  **F.**    **The Sparlins Fail to State A Claim for Breach of the Covenant of Good Faith and**
14         **Fair Dealing (Count Four).**
15
16      (23)    "Although every contract contains an implied covenant of good faith . . . . when

17  there is a special relationship between the victim and tortfeasor.  A special relationship is

18  characterized by elements of public interest, adhesion, and fiduciary responsibility." *Insurance*

19  *Co. of the West v. Gibson Tile,* 122 Nev. 455, 461-62, 134 P.3d 698 (2006) Court cited *Aluevich v.*

20  *Harrah's,* 99 Nev. 215, 217, 660 P.2d 986, 987 (1983)

21      (24)    Defendants did not originate the loan but immediately altered and ratified the notes

22  (without the approval or knowledge of the borrower) and 'funded' the originator (UAMC)

23  immediately upon approval of the loan applications.

24      (25)    Plaintiffs allegations with regards to discussions with BAC and BOA regarding loan

25  modifications, short sale options and deed-in-lieu options is not for argument.  Attached as

26  EXHIBITS 6 & 7, are phone conversation logs which began in February, 2008 and outline

27  numerous conversations between the Plaintiff and Defendant, including dates, times and names of

28  individuals that Plaintiff attempted to work out payment modifications, short sale and/or deed-in-

29  lieu options starting as far back as June, 2008.

30      (26)    At one point, Plaintiffs had been offered a short sale on property C which Plaintiff

31  promptly presented to the Defendant. (EXHIBIT 8).  This offer was only **$500 below the**

1 **outstanding balance** but the short sale was never processed after weeks and weeks of Plaintiff

2 continual calling.

3     (27)    Plaintiffs also tried to work out a deed-in-lieu with the Defendant on property A.

4 "The deed in lieu transaction clearly serves the public interest.  It not only avoids the expense and

5 delay of a foreclosure proceeding, but also reduces the pressure on scarce judicial resources." *The*

6 *Burst Bubble: Revisiting Foreclosure Law in Light of the Collapse of the Housing Industry*, by

7 Kasey Curtis,  Western State University Law Review, Volume 36, p.128.

8     (28)    One would have to ask themselves why the Defendant would not agree to any type

9 of loan modification, deed-in-lieu or short sale?  At one point, this Plaintiff was told by a BAC

10 representative that the 'true' investor will not allow for any modifications yet Plaintiffs were

11 continually 'strung along' for months with false hopes of getting any type of assistance whatsoever

12 from the Defendants.  Defendants production of the Master Pooling and Servicing Agreement will

13 confirm if the statement concerning the loan modification is true.

14 **G. The Sparlins Fail to State A Claim for Breach of Fiduciary Duty (Count Six).**

15     (29)    Defendants caused the Plaintiffs to take an action that Plaintiff would not have done

16 under normal circumstances had it not been for instructions received from a bank representative. In

17 June of 2008, Plaintiffs contacted the Defendants (phone logs attached as EXHIBITS 6 & 7)

18 seeking loan modifications on both loans included in this instant case.  Plaintiffs were instructed

19 that they would have to stop making payments and go in default before any type of modification

20 would be considered.   Plaintiffs were not, and had not been, in default on said loans and, in fact,

21 Plaintiff often paid in advance.  Plaintiffs enjoyed an excellent credit rating up to this point and

22 were very concerned about defaulting on the loan and the negative affect it would have on their

23 credit report.  Plaintiffs ultimately relied upon the verbal promise of the representative and ceased

24 making payments in January, 2009.

25     (30)    *Khast v Washington Mutual Bank* Judge Irma Gonzales issued a TRO to Khast

26 "because the banks misled him into defaulting on his mortgage".

27     (31)    *Garcia v World Savings FSB*, 183 Cal. App. 4th 1031 (2010) the court applied the

28 doctrine of promissory estoppels against the lender in a case in which a borrower "relied on the

29 verbal promise of a bank's employee to do something he wouldn't otherwise have done."

1   (32)   *Youngman v Nevada Irrigation Dist* 70 Cal. 2d at p. 249 stated "under this doctrine

2   a promisor is bound when he should reasonably expect a substantial change of position, either by

3   act or forebearance, in reliance on his promise"

4   (33)   *Wilson v Bailey* (1937) 8 Cal. 2d 416, 423, quoting *Carpy v Dowdell* (1897) 115

5   Cal. 677, 687) "The vital principle is that he who by his language or conduct leads another to do

6   what he would not otherwise have done shall not subject such person to loss or injury by

7   disappointing the expectations upon which he acted."

8   (34)   *Wake v Markwell & Co* (1953) 118 Cal. App. 2d 410, 420, "In such a case,

9   although no consideration or benefit accrues to the person making the promise, he is the author or

10   promoter of the very condition of affairs which stands in his way; and when this plainly appears, it

11   is most equitable that the court should say that they shall so stand."

12   (35)   "When a confidential relationship exists, the person in whom the special trust is

13   placed owes a duty to the other party similar to the duty of a fiduciary, requiring the person to act

14   in good faith with due regard to the interests of the other party. *Hamberg v. Barsky*, 50 A.2d 345,

15   347 (Pa. 1947). "We conclude that the record contains ample evidence of the existence and breach

16   of just such a relationship between Perry and Jordan." *Perry v. Jordan*, 111 Nev. 943, 946-47, 900

17   P.2d 335 (1995).

18   (36)   In *Long v. Towne*, 98 Nev. 11, 13, 639 P.2d 528, 529-30 (1982), the court stated

19   that:

20   "constructive fraud is **the breach of some legal or equitable duty** which, irrespective
21   of moral guilt, the law declares fraudulent because of its tendency to **deceive others or**
22   **to violate confidence.** Constructive fraud is characterized by a breach of duty arising
23   out of a fiduciary or confidential relationship.  A "confidential or **fiduciary**
24   **relationship"** exists when one reposes a special confidence in another so that the
25   **latter, in equity and good conscience, is bound to act in good faith and with due**
26   **regard to the interests of the one reposing the confidence.**

27
28
29   **H. The Sparlins Fail To State Any TILA Claim (County Seven).**

30   (37)   TILA and RESPA require that disclosures made be true and accurate.  By

31   Defendants withholding the true nature of the transaction, the true parties in interest, and the true

32   cost of the loan and in fact representing otherwise, this non-disclosure DOES amount to fraud and

33   certainly constitutes violations of regulatory legislation.

|

(38)     Plaintiff specifically stipulated each of the fees charged with particularity.  Plaintiff specifically alleged that said fees were fraudulent.  Plaintiff alleged that Defendant failed to provide a full disclosure by failing to provide documentation to prove that the fees were 1) reasonable[1];  2) that the creditor received no direct or indirect compensation[2] ; and 3) that the charges were paid to a third party unaffiliated with the creditor.[3]  As a result of violations of RESPA, Defendants are liable to Plaintiffs in an amount equal to three (3) times the amount of charges paid by Plaintiffs for "settlement services" pursuant to **12 U.S.C. sec. 2607(d)(2).**

(39)     Plaintiff specifically plead that they were charged false fees as stipulated on the HUD 1 Settlement Statements, in violation of **15 U.S.C. sec. 1601** et seq., **Regulation Z sec. 226.18(c), 18(d),** and **22.** (Property A, page 5 and Property C, page 9 of Amended Complaint).

(40)     Plaintiff specifically plead that Defendant failed to provide documentation to establish that said fees were not included in those fees expressly addressed by the **Real Estate Settlement Procedures Act (12 U.S.C. sec. 2601)** as forbidden to be charged **(12 U.S.C. sec. 2607)** to Plaintiff at settlement. (Property A, page 5 and Property C, page 9 on Amended Complaint).

(41)     Plaintiffs cause of action was very clear.  The Defendant violated federal statues, **15 U.S.C. § 1639; Reg.Z §§ 226.31** and **226.32;  Official Staff Commentry § 226.32(c)** and refused, and still refused, to disclose essential information about Plaintiffs accounts.

(42)     Plaintiffs further plead with specificity that Defendants were notified through the vehicle of a Qualified Written Request ("QWR") on January 19, 2010, under the authority of the **Truth-In-Lending Act ("TILA") § 1604(e), 15 U.S.C. § 1601** et seq. (1968) and **1692** et seq., and the **Fair Debt Collection Practices Act ("FDCPA") 15 U.S.C. § 1692c,** and the **Real Estate Settlement Procedures Act ("RESPA") 12 U.S.C. § 2605(e)** and **Regulation X at 24 C.F.R. § 3500,** to verify numerous items including, but not limited to, verification of the alleged debt and a copy of the Master Pooling and Servicing Agreements.  The documents mailed to Defendants all contained the verbiage "NOTICE TO AGENT IS NOTICE TO PRINCIPAL".

---

[1] Reg.Z § 226.4(c)(7)
[2] 24 C.F.R. § 3500 App.A.Section L
[3] "Affiliate" is defined by reference to the Bank Holding Company Act of 1956 (12 U.S.C. § 1841(k)). Reg.Z § 226.32(b)(2).  It includes any company that controls, or is controlled by or is under common control with the creditor. See Lopez v. Delta Funding Corp (E.D.N.Y. Dec 23, 1998), available at www.consumerlaw.org/unreported

1    (43)    Plaintiff sent the QWR out of the belief that fraud was indeed being committed, that

2    there was most likely no longer a Note, and thus there was no longer an obligation to continue

3    payments toward this alleged Note.

4    (44)    Defendants failed to respond within the 20 days required and also failed to resolve

5    the issues within 60 business days in direct violation of **Section 6 of RESPA**.  Non-compliance is

6    a violation of the act which gives rise to a claim for actual and statutory damages under **15 USC**

7    **1640.**

8    (45)    Because of Defendants non response to the "QWR" RESPA/TILA request, on

9    March 20, 2010 Plaintiff provided Defendants with a *Notice of Default, Notice of Right to Cancel,*

10   *Notice of Revocation of Power of Attorney* and *Notice of Appointment of Successor Trustee* on both

11   properties.  (EXHIBITS 10-11)

12   (46)    Plaintiff wanted to give the Defendant the benefit of the doubt about their lack of

13   response to the QWR send in February, 2010 so a second request was sent on May 8, 2010.  This

14   second QWR request was also met with total disregard.

15   (47)    **RESPA 2605(e)(2)(C)** requires that the Defendant: "after conducting an

16   investigation, provide the borrower with a written explanation or clarification that includes (i)

17   information requested by the borrower or an explanation of why the information requested is

18   unavailable or cannot be obtained by the servicer; and (ii) the name and telephone number of an

19   individual employed by, or the office or department of, the servicer who can provide assistance to

20   the borrower."

21   (48)    TILA allows borrowers to recover against assignees for originators' violations if

22   the violations are "apparent on the face of" federal disclosure statements. (**15 U.S.C. § 1641(a),**

23   **(e)(2)(2000)).**

24   (49)    Further, The Home Ownership and Equity Protection Act (HOEPA) imposes strict

25   liability on assignees who purchase high cost loans.  In general, holders of HOEPA loans are

26   "subject to all claims and defenses . . . that the borrower could assert against the originator of the

27   mortgage." Regulations implementing the Federal Trade Commission Act impose liability on

28   assignees for "all claims and defenses which the debtor could assert against the seller."

29   (50)    Any attempts by Defendants to distance themselves from liability by use of the

30   "holder-in-due-course doctrine" fails as Defendant must satisfy the requirements of a 'holder-in-

31   due course' as outlined in **U.C.C. Section 3-302** and Defendants have not provided one piece of

1    evidence to support that they are the owners of the note.  The real party in interest is the unknown

2    investor whose identity continues to be hidden by Defendants.   Only the person who has the right

3    to come to court (the currently unknown investor) can seek relief as recognized by the law. See

4    *Charles E Clark & Robert M Hutchins, The Real Party In Interest*, 34 Yale L.J. 259, 261 (1925)

5    (defining what constitutes the real party in interest).   **Federal Rule of Civil Procedure 17(a)** also

6    invokes this term which states, in part, "Every action shall be prosecuted in the name of the **real**

7    party in interest."

8            (51)     If the mortgage is a negotiable note, **Uniform Commercial Code sec. 3-203** is

9    generally understood to make the right of enforcement of the promissory note transferrable only

10   by delivery of the instrument itself to the transferee.  Restatement (Third) of Property, Mortgages

11   sec. 5.4 cmt. c.  There is no presumption under **Section 3-308** that the transferee by producing the

12   instrument, is entitled to payment.  The instrument, by its terms, is not payable to the transferee

13   and the transferee must account for possession of the unendorsed instrument proving the

14   transaction through which the transferee acquired it.

15           (52)     The Defendants are not the real party in interest and do not have standing to

16   foreclose on Plaintiffs property.  The Third Circuit has indicated that *a party is not the real party*

17   *in interest in the jurisdictional sense unless it is seeking to protect its own interests rather than*

18   *just fulfilling obligations to another party.*   See *Airlines Reporting v S & N Travel, 58 F.3d at 862*

19   (noting that the Plaintiff was the real party in interest for "procedural purposes" but not for

20   "jurisdictional purposes" because he was merely fulfilling contractural obligations.  *Farmer v.*

21   *Kinder*, 89 S.W.3d 447, 451 (Mo. banc 2002).  (Standing refers to a party's right to seek relief.

22   *Id.* It "requires that a party seeking relief have a legally cognizable interest in the subject matter

23   and that he has a threatened or actual injury." ) *Eastern Missouri Dist. Council v. St. Louis*

24   *County*, 781 S.W.2d 43, 46 (Mo. banc 1989).  (Standing requires the party to be sufficiently

25   affected so as to ensure a justiciable controversy. ) *Shannon v. Hines*, 21 S.W.3d 839, 841

26   (Mo.App. E.D. 1999).  (Therefore, a party "must have some actual, justiciable interest." *Id.* They

27   must have a recognizable stake.) *Wahl v. Braun*, 980 S.W.2d 322 (Mo.App. E.D. 1998).  (Lack of

28   standing cannot be waived and may be considered by the court sua sponte.) *Brock v. City of St.*

29   *Louis*, 724 S.W.2d 721 (Mo.App. E.D. 1987).  (If a party seeking relief lacks standing, the trial

30   court does not have jurisdiction to grant the requested relief.) *Shannon*, 21 S.W.3d at 842."

1      (53)    Plaintiff alleged, and will be prepared to prove at trial, that CHL, now BAC (a

2   subsidiary of BOA) maintained possession of the DOT in order to be able to file an IRS Form

3   1099a and write the entire amount of the original note off lender's capital gains tax and, thereby,

4   receive consideration a second time.

5      (54)    Plaintiff alleged, and will be prepared to prove at trial that, the original Note, if said

6   Note still exists, may give the "true" holder a claim against the Plaintiff, but would have no claim

7   against the property.

8      (55)    Plaintiff alleged, and will be prepared to prove at trial that Defendants, and the

9   attorneys claiming to represent same, have committed fraud by representing to the court that

10  Defendants are the real parties in interest in the contract of sale and has standing to take said

11  property from Plaintiff when no such claim exists.

12     (56)    Plaintiff has alleged, and will be prepared to prove at trial, that Defendants, by

13  claiming standing to express the provisions of the contract of sale and lien, claim to be real parties

14  in interest and, therefore, under the Federal Trade Commission Holder Rule **16 CFR 433**, are

15  subject to any claim Plaintiff may have against the original lender.

16     (57)    TILA does not require Plaintiff to notify Defendants of specific violations. Under the

17  Federal Rules of Civil Procedures, it may be sufficient to plead that the TILA has been violated.

18  **(Fed.R. Civ. P. 8(a))**.  Specific violations do not necessarily have to be alleged with particularity,

19  (*Brown v. Mortgagestar*, 194 F. Supp. 2d 473 (S.D. W. Va. 2002) (notice pleading is all that is

20  required in TILA case); *Herrara v. North & Kimball Group, Inc.*, 2002 WL 253019 (N.D. Ill. Feb..

21  20, 2002) (notice pleading sufficient; response to motion to dismiss can supplement complaint by

22  alleging facts re specific documents assigned); *Staley v. Americorp. Credit Corp.*, 164 F. Supp. 2d

23  578 (D. Md. 2001) (John Henry Doe, Pro Se need not specify specific statute or regulations that

24  entitle him to relief; court will examine complaint for relief on any possible legal theory); *Hill v.*

25  *GFC Loan Co.,* 2000 U.S. Dist. Lexis 4345 (N.D. Ill. Feb. 15, 2000).

26     (58)    Since Plaintiff had no reason to even suspect that government regulated financial

27  institutions would commit such acts and could not have discovered even the possibility of such

28  concealed acts, the principal of Equitable Tolling does apply to the three year period of rescission.

29     (59)    The equitable tolling principles are to be read into every federal statute of

30  limitations unless Congress expressly provides to the contrary in clear and unambiguous language,

31  (See *Rotella v. Wood*, 528 U.S. 549,560-61, 120 S. Ct. 1075, 145 L. Ed. 2d 1047 (2000)). Since

1    TILA does not evidence a contrary Congressional intent, its statute of limitations must be read to

2    be subject to equitable tolling, particularly since the act is to be construed liberally in favor of

3    consumers. The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on

4    excusable delay by the Petitioner," and inquires whether "a reasonable Petitioner would have

5    known of the existence of a possible claim within the limitations period." *Johnson v. Henderson*,

6    314 F.3d, (9th Cir.2002), *Santa Maria v. Pacific Bell*, 202 F.3d 1170, 1178 (9th Cir.2000).

7    Equitable tolling focuses on the reasonableness of the Petitioner's delay and does not depend on

8    any wrongful conduct by the Defendants. *Santa Maria*. at 1178.

9         (60)    Plaintiff believes that the Bank of New York Mellon is the current trustee of the

10   Note and DOT for Property A.

11        (61)    Plaintiff believes that the Bank of New York Mellon is the current trustee of the

12   Note and DOT for Property C.

13        (62)    Plaintiff alleges that the Note and DOT for Property A has been bundled,

14   securitized and sold to an undisclosed private investor through a Mortgage Backed Security

15   ("MBS") as outlined in paragraph 19 above.

16        (63)    Plaintiff alleges that the Note and DOT for Property C has been bundled,

17   securitized and sold to an undisclosed private investor through a Mortgage Backed Security

18   ("MBS") as outlined in paragraph 19 above.

19        (64)    The original and purported successor trustees have conspired and colluded to

20   deprive Plaintiff of their property and their civil rights including but not limited to equal credit

21   opportunities, and the right to enjoy property as is afforded to all citizens under the Fourteenth

22   Amendment by coercing and manipulating the Plaintiffs notes, deeds of trust and other documents

23   in order to cover up, conceal, and perfect a mortgage fraud scheme.

24        (65)    Plaintiffs have attempted, unsuccessfully, to determine if the services outlined in the

25   HUD1 Settlement Statements were necessary and that the Defendants did not take an undisclosed

26   markup on said fees.

27        (66)    At no time whatsoever did the Defendants disclose to the Plaintiffs:

28            (a) that the originating "lender" UAMC, had no intention of retaining ownership
29                interest in the mortgage loans or fully servicing same and in fact, Plaintiff
30                believes had already presold the loans, prior to closing, to Countrywide Home
31                Loans ("CHL");
32

(b) that the mortgage loans were actually intended to be repeatedly sold and assigned to multiple third parties, including one or more mortgage aggregators and investment bankers, including but not limited to the Defendants, for the ultimate purpose of bundling the Plaintiffs mortgages with hundred or perhaps thousands of others as part of a companion, support, or other tranches in connection with the creation of a REMIC "mortgage-backed security" to be sold by a securities firm and which, in fact, ended up as collateral for Asset-Backed Securities Certificates, created the same year as the closing;

(c) that the mortgage instruments and notes would be sold, transferred, or assigned separately to separate third parties so that the later "holder" of the note may not be in privity with or have the legal right to foreclose in the event of default;

(d) that in connection with the multiple downline resales and assignments of the mortgages and notes that assignees or purchasers of the notes may make "paydowns" against the notes which may effect the true amounts owed on the notes;

(e) that a successive assignee or purchaser of the notes and deeds of trust may not, upon assignment or purchase, unilaterally impose property insurance requirements different from those imposed as a condition of the original loan (also known as prohibition against increased forced-placed coverage) without the Plaintiffs prior notice and consent.

**1.   The Sparlins' Alleged Right of Recission Under TILA Is Time-Barred.**

(67)   " . . . the elements of rescission are as follows: (1) the character or relation of the parties (i.e., privity of contract); (2) the making of a contract; (3) a ground for rescission, including mistake, misrepresentations, or impossibility or impracticability of performance; (4) the party has rescinded the contract and notified the other party of rescission; (5) the rescinding party returned the benefits she received from the contract, if such a return is possible; and (6) an unusual equity exists, such as fraud, mistake, "turpitude of consideration," or the party has no adequate remedy at law." Megan Bittakis, *The Time Should Begin to Run When the Deed is Done: A Proposed Solution to Problems in Applying Limitations Periods to the Rescission of Contract*, Vol 44, University of San Francisco Law Review, p.761, citing *Crown Ice Mach. Leasing Co. v. Sam Senter Farms, Inc.*, 174 So.2d 614, 617 (Fla. Dist. Ct. App. 1965); 13 Am.Jr.2d *Cancellation of Instruments* sec. 51 (2010).

(68)   "A party must rescind a contract within a reasonable time, but what constitutes a reasonable time depends upon the facts of a particular case and must be determined by the trier of facts." *Wall v. Foster Petroleum Corp.*, 791 P.2d 1148, 1151 (Colo. Ct. App. 1989).  Therefore,

| **Case No: 10-503**

1    "delay alone does not necessarily constitute a waiver." *McDonald v. Shore*, 285 Ore. 151, 590 P.2d

2    218, 221 (Or. 1979)." *Mackintosh v California Federal Savings & Loan Association*, 113 Nev.

3    393, 935 P.2d 1154, 1161 (1997).

4

5              **2.  The Sparlins' Other Alleged TILA Claims are Time-Barred.**

6        (69)    Plaintiffs reassert and reaffirm all arguments presented under paragraphs 58-59 and

7    67-68 above.

8
9
10             **3.  The Court Should Not Apply Equitable Tolling To The Sparlins' Purported**
11                 **TILA Claims.**
12
13       (70)    Plaintiffs reassert and reaffirm all arguments presented under paragraphs 58-59 and

14    67-68 above.

15
16   **I.  The Sparlins Fail To State Any Claim Pertaining To Loan Modification or Short Sale**
17       **"Discussions".**
18
19       (71)    Plaintiffs reassert and reaffirm all arguments as outlined in paragraphs 23-28 above.

20
21   **J.  The Sparlins' "Real Party In Interest" And "Standing" Allegations Are Meritless.**
22
23       (72)    Plaintiffs reassert and reaffirm all arguments as outlined in paragraphs 49-51 above.

24       (73)    Plantiffs would also ask that this court take notice of a New Jersey Supreme Court

25    ruling just handed down on December 20, 2010 which was published and forwarded to all

26    members of the New Jersey Bar.  A series of new rules and regulations requiring lenders and their

27    attorneys to file a series of documents with the courts as to not only new foreclosure filings, but

28    also pending actions where no judgment has been entered as well as in cases where judgment has

29    been entered but no sale has taken place.  The rules adopted by New Jersey are following on the

30    heels of other states such as Florida, where the Supreme Court requires that all residential

31    foreclosure actions filed as of February 12, 2010 be **verified**.   Plaintiffs attach as EXHIBIT 12 for

32    a more in depth review of this new ruling.

33

1         **"The Practical Effect of Splitting the Note and Deed"**

2       (74)    "The practical effect of splitting the deed of trust from the promissory note is to

3 make it impossible for the holder of the note to foreclose, unless the holder of the deed of trust is

4 the agent of the holder of the note.   Without the agency relationship, the person holding only the

5 note lacks the power to foreclose in the event of default.  The person holding only the deed of trust

6 will never experience default because only the holder of the note is entitled to payment of the

7 underlying obligation.  The mortgage loan became ineffectual when the note holder did not also

8 hold the deed of trust.  MERS never held the promissory note, thus its assignment of the deed of

9 trust to Ocwen separate from the note had no force. See *George*, 76 S.W.2d at 371, *St. Louis Mut.*

10 *Life Ins. Co.*, 46 S.W.2d at 170."

11       (75)    "In general, a mortgage is unenforceable if it is held by one who has no right to

12 enforce the secured obligation. Restatement (Third) of Property, Mortgages, sec. 5.4 cmt. e. This

13 is because, "where a promissory note is secured by a mortgage, the mortgage is an incident to the

14 note." *Huntington v. McCarty*, 174 Vt. 69, 70 (2002) (citing *Island Pond Nat'l Bank v. Lacroix*,

15 104 Vt. 282, 294-95 (1932); see also *Carpenter v. Longan*, 83 U.S. (16 Wall.) 271, 275 (1872)

16 (stating "all the authorities agree that the debt is the principal thing and the mortgage an

17 accessory."). The Court finds the following analogy provided by the late Chester Smith of the

18 University of Arizona College of Law to be particularly apt - "The note is the cow and the

19 mortgage the tail. The cow can survive without the tail, but the tail cannot survive without the

20 cow." Restatement (Third) of Property, sec. 5.4, Reporters' Notes (quoting *Best Fertilizers of*

21 *Arizona, Inc. v. Burns*, 571 P.2d 675, 676 (Ariz. Ct. App. 1977)

22
23                         **It's Alphabet Soup**

24       (76)    As can be seen from the attached securitization chart (EXHIBIT 9), Entity A

25 (UAMC) originated the 'loan' secured by Plaintiffs properties but before we even signed on the

26 dotted line, had sold the loans to Entity B (CHL) who then promptly "sliced and diced" it along

27 with hundreds or thousands of other mortgage loans and transferred our notes into Entity C

28 (CWALT, Inc., a Special Purpose Vehicle) who sold certificates via Entity D (Alternative Trust

29 Loan 2007-HY2, a "trust" and Bank of New York Mellon ("BONY") a mortgage-backed security

30 "trustee") and other conduits, REMICs and intermediaries to Entities E,F,G,H and so on, investors

31 or groups of investors in Wall Street securities or derivatives.  The 'true' creditor would logically

1   be one or more of E,F, G,H, etc. who actually put up the money and stands to lose it in the event of

2   a default.  None of the transfers were ever properly recorded as true sales.  Entity E,F,G,H etc, the

3   creditors or true investors who actually put up the monies, a necessary and indispensable party to

4   this action, has not been yet identified in this instant case.  This information continues to be 'a

5   mystery' and withheld from Plaintiffs to this present day.  The role of "holder-in-due-course"

6   ceases to exist in a securitized loan, because even if a creditor could be identified, no beneficial

7   interest or partial interest was ever transferred to that creditor as required under the MBS Pooling

8   and Servicing Agreement.

9                              **Who and What Does the Plaintiff Owe?**

10       (77)    The obligation created by the note may have been paid in whole or in part by third

11   parties. These third-party payments include, but are not limited to,  the proceeds of credit default swaps,

12   insurance and allocations from the Toxic Assets Recovery Program (TARP).

13       (78)    The note may or may not be in default.  Default has been alleged and presumed but

14   never accounted for.  Plaintiff has never received any accounting of these third-party payments, the

15   existence of which is far from speculative.  This was a major subject of Judge James M Peck's January,

16   2010 ruling in the Lehman Brothers bankruptcy case and the same principles apply in the instant case.

17   Only when a full accounting has been provided, including all third-party payments, will the Plaintiffs

18   know who the 'true'  creditors are and how much he owes them.

19       (79)    This case is not a "Show Me The Note" Strategy.  Defendants are not the owners of the

20   note, so possession of the note is irrelevant.  Defendants have failed to prove any right or authority to

21   enforce the notes.  BAC is a servicer and not a creditor.  Neither is BONY a creditor in the instant case,

22   under any accepted definition of that term.  BAC as servicer has no right to foreclose without

23   documents and timely authority from the true creditor, who remains undisclosed and unidentified.

24       (80)    If the Defendants want to assert that they are not the creditor but are the agent for the

25   creditor then they must disclose who the true creditor is.  They must produce documentation that proves

26   they are the agent of the creditor and their agency relationship with the creditor.  They cannot assert that

27   they are foreclosing on behalf of an undisclosed principal.  BAC is not a creditor, neither is BONY a

28   creditor.  BONY clearly sold the subject transactions into asset-backed securities so the creditors would

29   be the actual people who parted with their money, to wit, the investors.  If the Defendants have timely

30   documented authority from the creditor, let them produce it.  This is exactly what Plaintiff is seeking.

31       (81)    What was clear from Plaintiffs preliminary forensic analysis was that the Defendants

32   transactions are subject to multiple agreements among other parties in the securitization chair, the scope

|

1  and effect of which have yet to be determined.  (See Lehman's BK case Judge James M. Peck, January,

2  2010 ruling) .  Plaintiff was not a party to these agreements, neither were they disclosed to Plaintiff at

3  any time.

4        (82)    There is no dispute that this loan was securitized.  The parties executed certain

5  documents months before they did any deal with Plaintiff.  The question is, what is the effect if any of

6  those documents on the Plaintiffs loans?  Who really owns what?  The Master Pooling and Servicing

7  Agreement by and between CHL and BONY, once provided, would reveal some, but not all of this

8  information.  This vital information continues to be withheld from the Plaintiffs by Defendants usage of

9  catch phrases such as "it's a secret", "it's proprietary" or simply "I'm not allowed to tell you who the

10  investor is".

11        (83)    The fact that Judge Peck has ruled on the prioritization of third-party payments in the

12  Lehman bankruptcy and his reciting in his ruling that they exist is all Plaintiff needs to assert that

13  Plaintiffs allegations are far from speculative.

14        (84)    The illegal and fraudulent attempt to foreclose on Plaintiffs properties is not simply

15  an isolated case but rather a common practice among the lending institutions of this country.

16  (EXHIBIT 14) Plaintiff did a quick search of the Bar Association official website www.abanet.org

17  and was able to find no fewer than thirty (30) foreclosure actions and cases that have been <u>lawfully</u>

18  <u>dismissed,</u> thereby not allowing the banks attempted foreclosure due to the banks failure to **<u>validate</u>**

19  **<u>and produce</u>** as stipulated by law.  This clearly shows the "bank fraud" that is being perpetrated on

20  the American public, this Plaintiff included.  (EXHIBIT 13)

21                        **<u>So Has the Obligation Been Paid?</u>**

22        (85)    Defendants have not and cannot claim that the obligations have or have not been paid by

23  third party payments.  The alleged obligations may or may not be in default.  This is a genuine issue of

24  fact.

25        (86)    Plaintiff is simply asking what anyone would ask in small claims court.  How much do I

26  owe, who do I owe it to, what payment have you received, did you credit all the payments, and who got

27  paid in these transactions?  Under TILA, Plaintiff has the right to know who made money all the way up

28  the securitization 'food chain'.  By Defendants not disclosing the 'other players' in the scheme at or

29  before the "closing" there are other liabilities, but first Plaintiff needs to know if anybody did get paid.

30  Plaintiff can't know that unless the Defendants comply with the statutes.  This was the sole purpose of

31  the mailing of the QWR, which Defendant has simply chosen to ignore.

1    (87)    Plaintiff knows that third party payments occurred.  Plaintiff knows they are an issue.

2    What Plaintiff doesn't know is who they came from, where they went, how they were allocated and

3    whether they should be, or were, allocated to Plaintiffs mortgage.  If paid in exchange for any interest or

4    insurance obligation on the pool the mortgage is in, then some part of that should be allocated to the

5    mortgage.

6    (88)    In the meanwhile, neither Defendant nor anyone else have the right to pursue foreclosure

7    until and unless they come forward and show with certainty they are the creditor. (i.e. the holder in due

8    course, or the agent of that creditor or holder)

9                         **Where does MES fit into this picture?**

10   (89)    MERS is a national electronic registration and tracking system that only "tracks"

11   the beneficial ownership interests and servicing rights in mortgage loans.

12   (90)    Even if the Court were to accept as fact any assignment from MERS, as nominee

13   for UAMC, purporting to transfer the Mortgage Deed and the Note to CHL, (which Plaintiff is

14   unable to locate in the records) this still would not be adequate to "prove the transaction" by which

15   Defendants acquired possession of the Note. See *In re Wilhem*, 407 B.R. 392, 404 (Bankr. D.

16   Idaho 2009).  Here, the Mortgage Deed names MERS "solely as nominee" for UAMC, but does

17   not, either expressly or by implication authorize MERS to transfer the Notes at issue.  See also

18   *Bellistri v. Ocwen Loan Servicing, LLC*, 284 S.W.3d 619, 623-24 (Mo. Ct. App. 2009) (finding

19   that MERS could not transfer the promissory note where there was no evidence that MERS held

20   the note or that the lender gave MERS authority to transfer the note).

21   (91)    "GMAC argues that it has standing to bring the Motion as the assignee of MERS.

22   in this case, MERS is named in the DOT as a beneficiary, solely as the "nominee" of GreenPoint,

23   holding only "legal title" to the interests granted to GreenPoint under the DOT.  A number of cases

24   have held that such language confers no economic benefit on MERS.  *See, e.g., In re Sheridan*,

25   2009 WL 631355, (Bankr. D. Idaho 2009); *In re Mitchell*, 2009 WL 1044368, (Bankr. D. Nev.

26   2009); *In re Jacobson*, 402 B.R. 359, 367 (Bankr. W.D. Wash. 2009).  As noted by the *Sheridan*

27   court, MERS "collects no money from debtors under the note nor will it realize the value of the

28   property through foreclosure of the deed of trust in the event the note is not paid. Because MERS

29   has no financial interest in the Note, it will suffer no injury if the Note is not paid and will realize

30   no benefit if the DOT is foreclosed.  Accordingly, MERS cannot satisfy the requirements of

31   constitutional standing. GMAC, as MERS' assignee of the DOT, "stand in the shoes" of the

32   assignor, taking only those rights and remedies the assignor would have had. *Hunnicutt Constr.*

|

1  *Inc. v. Stewart Title & Trust of Tuscon, Trust No. 3496,* 187 Ariz. 301, 304 (Ct. App. 1996) citing

2  *Van Waters & Rogers v. Interchange Res., Inc.,* 14 Ariz. App. 414, 417 (1971); *In re Boyajian,*

3  367 B.R. 138, 145 (9th Cir. BAP 2007).  Because GMAC is MERS' assignee, it cannot satisfy the

4  requirements of constitutional standing either."

5       (92)    The word "nominee" is defined nowhere in the mortgage document, and the

6  functional relationship between MERS and UAMC is likewise not defined.  See *Landmark*

7  *National Bank v. Kesler,* 216 P.3d 158, 165 (Kan. 2009) (finding that in the absence of contractual

8  definition, definition of "nominee" is left to judicial interpretation). The only legal definition of

9  "nominee" appears to be from Black's Law Dictionary, which defines the term as "a person

10  designated to act in place of another, in a very limited way" and as "a party who holds bare legal

11  title for the benefit of others or who receives and distributes funds for the benefit of others."

12  *Black's Law Dictionary* 1076 (8th ed. 2004).

13       (93)    MERS itself argued before the Nebraska Supreme Court that as "nominee," it

14  merely "immobilizes the mortgage lien while transfers of the promissory notes and servicing rights

15  continue to occur." *Mortgage Electronic Registrations Systems, Inc. v. Nebraska Dept. of Banking*

16  *and Finance,* 704 N.W.2d 784, 787 (Neb. 2005) (quoting brief for MERS).  The Court found the

17  role of MERS to be very limited: "MERS serves as legal title holder in a nominee capacity,

18  permitting lenders to sell their interests in the notes and servicing rights to investors without

19  recording each transaction." *Id.* at 788.  This would suggest that MERS, as a "nominee," is

20  necessarily detached from the promissory note, therefore, its relationship to a transferee is "akin to

21  that of a straw man," see *Kesler,* 216 P.3d at 166, whose job is limited to transfer of the mortgage

22  deed."

23       (94)    This view is similar with the Black's Law definition of "nominee."  MERS has

24  authority to act "in a very limited way" - it "holds bare legal title for the benefit of others."

25  *Black's Law Dictionary* 1076 (8th ed.2004).  There is no evidence that MERS's authority extends

26  to the transfer of the promissory note or that MERS acts as an agent for the lender.  Rather than

27  define MERS as an "agent," the Mortgage Deed specifically defines MERS as the unique legal

28  "nominee," thereby designating MERS to act "in a very limited way." See *Id.*  Without any

29  further evidence as to MERS's authority as a "nominee," then MERS does not have the authority

30  to transfer the promissory note.

1    (95)    Even if the Defendant were to produce the assignments of the Mortgage Deed from

2  MERS, this Court cannot allow the assignee of only a security interest to enforce the mortgage

3  deed, as this could expose the obligor to a double liability;  a "person entitled to enforce,"  could

4  later rightly seek to enforce the unsecured obligation.

5    (96)    William Hultman, Secretary of MERS, has testified under oath that loans are

6  registered to a "MERS Member" who has entered into the MERS Membership Agreement.  MERS

7  Members enter into a contract with MERSCORP to electronically register and track beneficial

8  ownership interests and servicing rights in MERS registered loans.  MERS Members agree to

9  appoint MERS, which MERSCORP owns, to act as their common agent, or nominee, and to name

10  MERS as the lienholder of record in a nominee capacity on all recorded security instruments

11  relating to the loans registered on the MERS System.  When a promissory note is sold by the

12  original lender to others, the various sales of the notes are tracked on the MERS System."

13    (97)    MERS "Terms and Conditions identifies MERS' interests.  The Terms and

14  Conditions say this:

15       "MERS shall serve as mortgagee of record with respect to all such mortgage
16       loans solely as a nominee, in an administrative capacity, for the beneficial
17       owner or owners thereof from time to time.  **MERS shall have no rights**
18       **whatsoever to any payments made on account of such mortgage loans, to**
19       **any servicing rights related to such mortgage loans, or to any mortgaged**
20       **properties securing such mortgage loans.**  MERS agrees not to assert any
21       rights (other than rights specified in the Governing Documents) with respect to
22       such mortgage loans or mortgaged properties.  References herein to
23       "mortgages(s)" and "mortgagee of record" shall include deed(s) of trust and
24       beneficiary under a deed of trust and any other form of security instrument
25       under applicable state law."
26
27    (98)    A "beneficiary" is defined as "one designated to benefit from an appointment,

28  disposition, or assignment . . . or to receive something as a result of a legal arrangement or

29  instrument." *Black's Law Dictionary 165* (8th ed. 2004).  But it is obvious from the MERS'

30  "Terms and Conditions" that **MERS is not a beneficiary as it has no rights whatsoever to any**

31  **payments, to any servicing rights, or to any of the properties secured by the loans.**  To reverse

32  an old adage, if it doesn't walk like a duck, talk like a duck, and quack like a duck, then it's not a

33  duck.

34    (99)    A person holding only a note lacks the power to foreclose because it lacks the

35  security, and a person holding only a deed of trust suffers no default because only the holder of the

1   note is entitled to payment on it.  See *Restatement (Third) of Property Mortgages* sec. 5.4 cmt. e

2   (1997).

3       (100)   Nothwithstanding all of the above, Defendants are in violation of **15 U.S.C.**

4   **1641(g)** In addition to other disclosures required by this subchapter, not later than 30 days after

5   the date on which a mortgage loan is sold or otherwise transferred or assigned to a third party, the

6   creditor that is the new owner or assignee of the debt shall notify the borrower in writing of such

7   transfer, including – **(A)** the identity, address, telephone number of the new creditor; **(B)** the date

8   of transfer; **(C)** how to reach an agent or party having authority to act on behalf of the new

9   creditor; **(D)** the location of the place where transfer of ownership of the debt is recorded; and **(E)**

10  any other relevant information regarding the new creditor.  The Defendants failed to comply.

11      (101)   In short, MERS and its members arrogated the right to refuse to record.  Non-

12  members, lowly beings all, are reduced to actually complying with the law and are hobbled by the

13  ancient Anglo-American system of recording.  The MERS System is nothing more than an illegal

14  substitute for recording and is based on a fiction – that MERS is a proper beneficiary.

15  HOWEVER, THERE WAS MORE THAN ONE ILLEGAL PURPOSE – one purpose was to

16  avoid assignments.  Another, at least de facto purpose, is to conceal the identities of the 'true'

17  beneficial owners from the borrowers, in violation of **15 U.S.C. sec. 1641(g).**

18                          **SUFFICIENCY OF PLEADING**

19      (102)   A complaint should not be dismissed "unless it appears beyond a doubt that the

20  Plaintiff can prove no set of facts in support of her claim which would entitle her to relief".

21  (*Housley v. U.S. (9th Cir. Nev. 1994 35 F.3d 400, 401)*

22      (103)   "All allegations of material fact in the complaint are taken as true and construed in

23  the light most favorable to Plaintiff." (*Argabright v.United States, 35 F.3d 1476, 1479 (9th Cir.*

24  *1996).*

25      (104)   Plaintiff has sufficiently pled that relief can be granted on each and every one of the

26  complaint's causes of action.

27      (105)   The Complaint includes short, plain and precise statements of the basis for relief in

28  accordance with Fed. Rule Civ. Proc. 8(a).

29      (106)   The Complaint contains cognizable legal theories, sufficient facts to support

30  cognizable legal theories, and seeks remedies to which Plaintiff s are entitled.   (*Balistreri v.*

|

1  *Pacifica Police Dept.*, *901 F.2d 696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913*

2  *(9th Cir. 1986)).*

3  (107)   "The legal conclusions in the complaint can and should be drawn from the facts

4  alleged, and, in turn, the court should accept them as such." (*Clegg v. Cult Awareness Network*, 18

5  *F.3d 752* (9th Cir, 1994)).

6  (108)   Plaintiff's complaint contains claims and has a probable validity of proving a "set of

7  facts" in support of their claim entitling them to relief. (*Housley v. U.S.* (9th Cir. Nev. 1994) 35

8  *F.3d 400, 401).* Therefore, relief as requested herein should be granted.

9  **CONCLUSION**

10  (109)   Absent a Court order enforcing the QWR and allowing discovery, there are

11  numerous genuine issues of fact concerning the validity and ownership of our notes, the validity

12  and ownership of our Deeds of Trust, the presumption of defaults, the identify of necessary and

13  indispensable parties, the status of the Plaintiffs accounts, and other factors that are unknown and

14  have not voluntarily been disclosed by the Defendants.  Whether or not the Plaintiffs Complaint

15  has been procedurally correct, the fact remains that Plaintiff has a right to the truth and the

16  information requested.   Without this vital information, the court is prevented from deciding the

17  case on the merits, which could cause an open-ended liability for and against multiple parties,

18  many of whom seem to have claims or be possessed of colorable claims to the same alleged

19  obligations, notes and mortgages.  It is therefore appropriate and necessary that the Court not

20  dismiss this case.

21  **DEMAND FOR TRIAL BY JURY**

22  (110)   Plaintiffs assert their rights under the Seventh Amendment to the U.S. Constitution

23  and demand, in accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues.

24
25  **WHEREFORE**, Plaintiffs move this court to DENY Defendants BOA and BAC Motion to

26  Dismiss and each of them, as follows:

27  ●For disgorgement of all amounts wrongfully acquired by Defendants according to proof at

28  trial;

29  ●For actual monetary damages in the amount of $924,546.81 for Property A and

30  $913,554.30 for Property C, a combined total of $1,838,101.11.

31  ●For pain and suffering due to extreme mental anguish in an amount to be determined at

Response to Motion to Dismiss_BAC

Case No: 10-503

1  trial;

2      ●For pre-judgment and post-judgment interest according to proof at trial;

3      ●For punitive damages according to proof at trial in an amount equal to $2,773,640.43 for

4  Property A and $2,740,662.90 for Property C, a combined total of $5,514,303.33.

5      ●For such other relief as the Court deems just and proper.

Sharon J Sparlin

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and exact copy of the above has been furnished by U.S.
Mail on this _____29th_____ day of December, 2010 to the following:

MAYNARD CRONIN ERICKSON
CURRAN & REITER, P.L.C.
Douglas C Erickson, #012130
Jennifer A Reiter, #017502
3200 North Central Avenue, Ste 1800
Phoenix, Arizona 85012
        Attorneys for Defendants Chase Home Finance, LLC and JPMorgan Chase & Co

BRYAN CAVE LLP
Robert W Shely #014261
Coree E Neumeyer #025787
Michael B Dvoren #027386
Two North Central Avenue, Ste 2200
Phoenix, Arizona  85004-4406
        Attorneys for Defendants BAC Home Loans Servicing, LP and Bank of America, NA

Sharon J Sparlin